**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| U.S. ORDNANCE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-2304 (ESH) |
| | ) | |
| U.S. DEPARTMENT OF STATE, <u>et al.</u>, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MOTION TO DISMISS**

Defendants U.S. Department of State, John Hillen, Assistant Secretary of State for Political & Military Affairs, Rose M. Likens, Deputy Secretary (formerly Acting Assistant Secretary of State for Political & Military Affairs), and David M. Trimble, Director, Office of Defense Trade Controls, through undersigned counsel, respectfully request that this Court dismiss plaintiff's claims in their entirety for lack of subject matter jurisdiction. Defendants respectfully refer the Court to the accompanying memorandum in support of this motion. A proposed Order is also included herewith.

March 23, 2006                          Respectfully submitted,


_____/s/_____
KENNETH L. WAINSTEIN, DC BAR #451058
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC BAR #434122
Assistant United States Attorney


_____/s/_____
JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
555 Fourth Street, N.W. - Civil Division
Washington, D.C.  20530
(202) 307-1249
(202) 514-8780 (facsimile)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| U.S. ORDNANCE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-2304 (ESH) |
| | ) | |
| U.S. DEPARTMENT OF STATE, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

## **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Plaintiff in this action requests that this Court order the State Department and its employees to issue it a license to export defense articles to foreign countries. The most surprising aspect of plaintiff's complaint is that the company requests such relief while at the same time plaintiff is subject to a forthcoming formal administrative proceeding by the Department of State for alleged willful violations of the Arms Export Control Act and its implementing regulations, the International Traffic in Arms Regulations. In fact, it is clear that plaintiff has filed this action solely in an attempt to avoid the forthcoming administrative proceeding. In sum, this Court lacks jurisdiction to hear plaintiff's claims for several reasons.

First, to the extent that plaintiff seeks an Order requiring the State Department to process its license applications, such a request is moot. On March 10, 2006, the Director of the Office of Defense Trade Controls Compliance denied plaintiff's license applications. Thus, to the extent this Court *could* hear plaintiff's claims requesting an Order that the State Department process its license applications, such a claim is no longer viable.[1]

---

[1] As explained below, this Court does not have subject matter jurisdiction to hear any challenges to the processing or decisions on export licences, as such authority is committed to the discretion of the agency by law.

Second, to the extent that plaintiff seeks to have this Court review the Department of State's denial of its license applications under the Administrative Procedure Act, this Court lacks jurisdiction to hear such a claim.  Because the grant or denial of an export license is "committed to the agency discretion by law," this Court may not second guess the State Department's decision on the license applications, and must dismiss plaintiff's claim.

Third, to the extent that the Court determines it does have jurisdiction under the APA, plaintiff may not request review until **after** the conclusion of the forthcoming formal administrative enforcement action against plaintiff at the State Department.[2]  Only after the conclusion of that proceeding will there be a decision on any possible debarment of plaintiff.[3]

Finally, to the extent that plaintiff requests that the Court issue a declaratory judgment that it is in compliance with ITAR, this Court lacks jurisdiction to do so.  Because the issuance or denial of a license to export defense articles, and to determine if a party is in compliance with ITAR, is committed to the discretion of the State Department by law, this Court has no authority to issue such a declaration.

---

[2]   In making this argument, defendants do **not** concede that this Court would have jurisdiction to hear a challenge to a formal enforcement proceeding.  In fact, because such a proceeding is also committed to the discretion of the agency, a Court would not have jurisdiction to review any final decision of the agency.  See 22 C.F.R. § 128.1 ("Exclusion of functions from the Administrative Procedure Act").

[3]   Plaintiff may also be subject to possible civil penalties in addition to debarment.  See 22 C.F.R. § 127.1.  Pending the outcome of an administrative proceeding, plaintiff could be subject to a possible interim suspension under Section 127.8 of the ITAR whereby it would be prohibited by Order from directly or indirectly participating in export activities.  Whether to impose an interim suspension is committed to the discretion of the Agency.  22 C.F.R. 127.8.

2

## FACTS AND PROCEDURAL HISTORY

In 1997, Curtis Lynn Debord ("Debord Sr.") was indicted for, among other things,

violations of Section 38 of the Arms Export Control Act ("AECA") by smuggling arms into the

U.S., dealing in firearms without a license, entry by false statement, conspiracy, making false

statements, and witness tampering.[4]  See United States v. Debord, No. 97-CR-239 (N.D. Cal.).

While under indictment for violating the AECA, Debord Sr. was generally ineligible to

participate in matters relating to the export of defense articles and services, as specified in the

International Traffic in Arms Regulations ("ITAR"), the AECA's implementing regulations.[5]

In February 2000, plaintiff U.S. Ordnance, Inc. ("USO" or "plaintiff") registered with the

Department of State's Directorate of Defense Trade Controls ("DDTC")[6] as a manufacturer and

exporter of defense articles and has remained registered since then.[7]  Debord Sr.'s son, Curtis

---

[4]  In June 2005, the U.S. District Court for the Northern District of California dismissed the indictment against Debord Sr.  See United States v. Debord, No. 97-CR-239 (N.D. Cal.). This dismissal had no effect upon Debord Sr.'s status as an ineligible party under the ITAR, nor any of the consequences that arose from that status.  The fact that the indictment was subsequently dismissed neither changed nor excused the reporting obligations on behalf of USO.

[5]  The ITAR is found at 22 C.F.R. §§ 120-130.  A person indicted for violating the AECA is generally ineligible pursuant to Section 120.1(c) of the ITAR.  See 22 C.F.R. § 120.1(c).  As provided by Section 127.1(c) of the ITAR, an ineligible person may not obtain any benefit or have any direct or indirect interest in the export of defense articles without disclosure to and approval by the DDTC.  See 22 C.F.R. § 120.1(c).  Also, Sections 122.2(b), 122.4(a) and 126.13(a) of the ITAR require that the ineligible status of a senior official of a manufacturer or exporter of defense articles be disclosed in its registration submission and any application for an export license.  22 C.F.R. §§ 122.2(b), 122.4(a) & 126.13(a).  Finally, under Section 126.7(a) of the ITAR the Department of State applies a policy of denial with respect to any application in which an ineligible person is involved.  See 22 C.F.R. § 126.7(a).

[6]  In early 2003, the former Office of Defense Trade Controls was realigned and renamed the Directorate of Defense Trade Controls ("DDTC").  The Secretary of State has delegated responsibility for administration of the ITAR to DDTC and its various officers.

[7]  There is no dispute in this case that the M-60 machine guns and related parts at issue are defense articles and are subject to regulation by the AECA and the ITAR.

3

Lee Debord ("Debord Jr."), is the President, Treasurer, Secretary and sole director and owner of USO.

In May 2004, DDTC's Office of Defense Trade Controls Compliance ("DTCC") learned that Debord Sr. was associated with USO.[8] By letter dated June 2, 2004, DTCC advised USO that, pending receipt and evaluation of additional information concerning Debord Sr.'s activities with USO, USO's applications would be processed only as transaction exceptions that must be supported by a request meeting strict national security, foreign policy and law enforcement criteria. See Exhibit 1 (Letter from D. Carroll, Chief, Enforcement Division, DTCC, to C. Debord Jr. (June 2, 2004)). Application of such license review criteria in effect imposed a policy of denial for plaintiff's export license applications under the ITAR.

In response to the June 2, 2004 request, USO submitted information that showed, among other things, that USO had submitted applications for licenses that may have failed to disclose, as required by the ITAR, that an ineligible person, Debord Sr., served as a senior official from July 2000 to June 2004, had a direct or indirect interest in the transactions, and obtained benefits therefrom by earning over $1 million in salary and bonuses that appeared to be attributable in large part to USO's export of defense articles. See Exhibits 2 (Letter from C. Debord Jr. to D. Carroll, Chief, Enforcement Division, DTCC (June 8, 2004)) & Exhibit 3 (Letter from C. Debord Jr. to D. Carroll, Chief, Enforcement Division, DTCC (June 21, 2004)). By letter of June 24, 2004, DTCC informed USO that, pursuant to the ITAR, it was suspending USO's previously issued license and that these as well as any future applications would be considered only under

---

[8] The Office of Defense Trade Controls Compliance ("DTCC") is responsible for compliance and enforcement matters under the ITAR. See 22 C.F.R. § 120.1.

4

the transaction exception procedure.  See Exhibit 4 (Letter from D. Trimble, Director, DTCC, to C. Debord Jr. (June 24, 2004)).

Thus, while continuing its administrative investigation into USO for potential violations of ITAR, and based on concerns about possible violations of the ITAR, DTCC suspended USO's outstanding licenses and imposed a policy of denial on pending and future applications for licenses pursuant to Section 126.7(a) of the ITAR.[9]  At the time of the June 2 and June 24 actions, USO had seven applications for licenses pending, of which three were the subject of transaction exemption requests (which were denied in October 2004) and four were returned without action because no transaction exemption requests were submitted.  Also, USO had thirty previously issued licenses suspended; however, since deliveries were made on eighteen of them, the suspension affected only twelve temporary export licenses to support USO's marketing activities.

In its June 24, 2004 letter, and again by letter dated July 9, 2004, DTCC asked USO for complete information concerning Debord Sr.'s export-related activities, as well as additional violations USO disclosed concerning its failure to report compensation paid to certain persons as required by Part 130 of the ITAR in connection with past exports, including to apparent unregistered brokers.  See Exhibit 4 & Exhibit 5 (Letter from D. Trimble, Director, DTCC, to C. Debord Jr. (July 9, 2004)).  On July 9, 2004, DTCC also wrote to Debord Sr. to remind him of

---

[9]    See also 22 U.S.C. § 2778(g)(3)(B) (Section 38(g)(3)(B) of the AECA) (specifically authorizing denial if there is reasonable cause to believe that the applicant for a licence has violated the AECA, including its implementing regulations).  The grounds for denial in Section 126.7(a) of the ITAR are much broader, and the statutory basis for the regulatory provision includes not only Section 38(g)(3)(B), but also the broader regulatory authorities in Section 38(a)(1) and 38(b)(2).  22 U.S.C. §§ 2778(a)(1) & (b)(2)).

5

his ineligibility stemming from the indictment, the failure to disclose his association with USO as a senior official or the benefits he received from exports, as required by the ITAR.  See Exhibit 6 (Letter from D. Trimble, Director, DTCC, to C. Debord Sr. (July 9, 2004)).  DTCC further directed Debord Sr. to cease and desist from any activities regulated by the AECA and the ITAR without fully complying with all the provisions of the law and regulations and to make a full disclosure of his AECA/ITAR activities since his 1997 indictment.  Id.

From July 2004 to April 2005, DTCC continued to receive and review information submitted by USO and the Debords.  In April 2005, after USO completed its submission of the requested information, and due to the fact that USO and the Debords had indicated a desire to enter a joint settlement of an administrative enforcement action, DTCC initiated a process intended to resolve the alleged violations by USO and the Debords.  Accordingly, on April 4, 2005, DTCC took the first step towards reaching a Consent Agreement by issuing a Draft Charging Letter to USO and the Debords, pursuant to Section 128.11(b) of the ITAR, which permits settlements based on proposed charges, as distinguished from a formal, signed charging letter.  See Exhibit 7 (Draft Charging Letter).

Throughout April and May, however, little progress was made toward settlement.  While USO had indicated previously that it could accept the draft Charging Letter as the basis to proceed to the next stage – which would involve discussion of DTCC's draft Consent Agreement, it nevertheless submitted a proposed Consent Agreement containing unacceptable terms, including lack of a cash penalty and a provision that he had been previously informed by

DTCC would not be acceptable (i.e., an undertaking that there would be no referral to any other U.S. agency with respect to this case).[10]

In late May 2005, DTCC referred the case to the Department of Justice ("DoJ") for its consideration of whether to bring new criminal charges against USO and the Debords for violation of the AECA and ITAR. At that time, DTCC informed USO and Debord Jr. that it was putting settlement discussions on hold pending review by DoJ. In early August 2005, DoJ decided not to pursue a new prosecution against USO or the Debords.

Before DTCC could contact USO and the Debords to see if they were interested in resuming settlement discussions, however, USO submitted a petition to the then Acting Assistant Secretary of State for Political-Military Affairs, which oversees DDTC and DTCC, to lift the policy of denial and to remove the Director of DTCC, David C. Trimble, from further involvement with the USO licensing matter. See Exhibit 8 (Letter from R. Sanders, Esq. to J. Hillen, Asst. Sec. of State for Political-Military Affairs (Sept. 9, 2005)). On October 18, 2005, Assistant Secretary for Political-Military Affairs Hillen rejected USO's petition and informed USO that DTCC would follow up on how to resolve the outstanding matter. See Exhibit 9 (Letter from J. Hillen, Asst. Sec. of State for Political-Military Affairs, to R. Sanders, Esq. (Oct. 18, 2005)).

On October 26, 2005, DTCC sent a letter to USO reminding it that it remained under a policy of denial and informing it that, despite the dismissal of the indictment, Debord Sr.

---

[10]    In response to the concerns raised earlier by USO about possible criminal prosecution, DTCC informed USO that a Consent Agreement can deal only with civil administrative violations within State's jurisdiction and, thus, cannot preclude action by the Department of Justice based on information developed by the State Department.

remained subject to a policy of denial and generally ineligible under the ITAR.  See Exhibit 10

(Letter from D. Trimble, Director, DTCC, to C. Debord Jr. (Oct. 26, 2005)).  The letter also

provided a copy of a proposed draft Charging Letter to USO, and asked if USO and Debord Jr.

remained interested in settling the charges.[11]  Id.  A similar letter was sent to Debord Sr.  See

Exhibit 11 (Letter from D. Trimble, Director, DTCC, to C. Debord Sr. (Oct. 26, 2005)).

Instead of timely responding to the draft Charging Letter, USO filed this action on

November 29, 2005.  On December 2, 2005, plaintiff also filed a motion for a preliminary

injunction, which the Court consolidated for trial on the merits and set a briefing schedule.  See

Dec. 9, 2005 Minute Order.  On December 21, 2005, DTCC again sent a letter to USO

reminding USO of the draft Charging Letter, stating that DTCC remains open to negotiating a

settlement, asking USO to respond in a timely manner, and outlining why USO's then pending

applications for licenses failed to satisfy necessary requirements for considering a transaction

exemption from the policy of denial.[12]  See Exhibit 12 (Letter from D. Trimble, Director,

DTCC, to C. Debord Jr. (Dec. 21, 2005)).

USO and the Debords failed to respond to the draft Charging Letter until February 3,

2006, at which time its sole response was to claim that the charges set forth in the draft Charging

Letter were entirely without merit.  See Exhibit 13 (Letter from J.R. Conte, Esq. to D. Trimble,

Director, DTCC (Feb. 3, 2006)).  Subsequently, USO and the Debords agreed in principle to

---

[11]   The draft Charging Letter alleged 35 violations of AECA by USO and the Debords.

[12]   The December 21, 2005 letter also noted that the policy of denial is distinct from
either statutory or administrative debarment.  In its September 2005 petition to the Acting
Assistant Secretary of State and its complaint in this action, USO has attempted to blur this
distinction, equating the exercise of discretion to approve or deny a license application with the
imposition of a penalty.

8

settle on terms requested by DTCC, <u>see</u> Exhibit 1 to Plaintiff's Feb. 15, 2006 Motion to Stay, but then abruptly reversed ground and terminated settlement discussions.

On March 10, 2006, in light of USO's failure to provide DTCC information to support a transaction exception for USO's pending license applications, Mr. Trimble, the Director of DTCC, denied such applications pursuant to Section 126.7(a) of the ITAR. <u>See</u> Exhibit 14 (Letter from D. Trimble, Director, DTCC, to C. Debord Jr. (Mar. 10, 2006)). In addition to denying USO's pending license applications, and after reviewing USO's response to the draft Charging Letter, Mr. Trimble began preparations for the process to formally charge USO with violations of AECA and ITAR in an administrative proceeding under Part 128 of the ITAR.

<u>**ARGUMENT**</u>

**I.     TO THE EXTENT PLAINTIFF SEEKS TO HAVE THIS COURT ORDER THAT THE STATE DEPARTMENT PROCESS ITS LICENSE APPLICATIONS, SUCH A CLAIM IS MOOT**

Plaintiff's complaint and motion for a preliminary injunction request that the Court Order the State Department to process USO's pending license applications. Compl. at p.6 (requesting "an Order directing employees of the Defense Trade Controls to process all transaction applications received from U.S. Ordnance subsequent to June 2004"); Pl.'s Motion for Preliminary Injunction at p.6 ("WHEREFORE, for all of the foregoing reasons Plaintiff requests that the court issue a preliminary injunction directing the defendants to promptly process his export licenses."). Such relief, however, is moot.

As explained above, the State Department, through DDTC, exercised its discretion and denied plaintiff's pending applications on March 10, 2006. Accordingly, plaintiff's request that the Court order the State Department to process its license application is now moot and its claims

must be dismissed.[13] See, e.g., Barabski v. Buckles, No. 02-0073 (HHK) (D.D.C. Oct. 31, 2002)

(dismissing plaintiff's request for an order that the Treasury Department process his applications

to import firearms as moot once the Treasury denied plaintiff's license application); In Re

Beehive Telephone Co., Inc., 1999 WL 1215782, *1 (D.C. Cir. Nov. 5, 1999) (dismissing as

moot petition for writ of mandamus where, after filing of case, agency denied the request that

petitioner claimed agency had failed to act upon); U.S. ex rel. Chicago Great Western R.R. Co.

v. I.C.C., 294 U.S. 50, 60 (1935) ("[w]here judgment or discretion is reposed in an

administrative agency and has by that agency been exercised, courts are powerless by the use of

the writ [of mandamus] to compel a different conclusion").  See also DeFunis v. Odegaard, 416

U.S. 312, 316 (1974) (federal courts are without power to decide questions that cannot affect the

rights of litigants in the case before them); Fraternal Order of Police v. Rubin, 134 F. Supp.2d

39, 41 (D.D.C. 2001) (no justiciable controversy is presented when the question to be

adjudicated has been mooted by subsequent developments); Columbian Rope Co. v. West, 142

F.3d 1313, 1316 (D.C. Cir. 1998) ("Even where litigation poses a live controversy when filed,

the [mootness] doctrine requires a federal Court to refrain from deciding it if events have so

transpired that the decision will neither presently affect the parties' rights nor have a more-than-

speculative chance of affecting them in the future."); Action on Smoking & Health v. Dep't of

Labor, 28 F.3d 162, 163 (D.C. Cir. 1994) (claim was moot once OSHA issued a notice of

proposed rulemaking).

---

[13]  To the extent that plaintiff claims it was entitled to have the license applications granted, as opposed to denied, that claim is addressed below.  In summary, however, because the grant or denial is committed to the discretion of the agency by law, the Court lacks jurisdiction to hear such a claim.

II.    **BECAUSE THE DECISION TO ISSUE OR DENY A LICENSE TO EXPORT DEFENSE ARTICLES HAS BEEN COMMITTED TO AGENCY DISCRETION BY LAW, THIS COURT LACKS JURISDICTION TO HEAR AN APA CHALLENGE TO ANY SUCH DECISION**

Plaintiff's complaint in this action also asserts that defendants have violated the Administrative Procedures Act and the International Traffic in Arms Regulations by failing to approve export license applications plaintiff submitted.  Accordingly, plaintiff relies on the APA as a basis for jurisdiction in this case.

It is well established that the APA does ***not*** provide for jurisdiction in cases like this one where the agency action is committed to agency discretion by law.  See 5 U.S.C. § 701(a)(2). The reason for this exception to the APA is simple, a statute committing an action to the discretion of the agency provides no justiciable standard by which a court may review the agency's decision.  Webster v. Doe, 486 U.S. 486, 599-600 (1988); Heckler v. Chaney, 470 U.S. 821 (1985); Citizens to Protect Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971).

In looking for a judicially manageable standard with which to interpret DDTC's authority and discretion to issue licenses to export defense articles, the Court should consider the statutory language and structure as well as the nature of the agency decision.  See Drake v. FAA, 291 F.3d 59, 70 (D.C. Cir. 2002), cert. denied, 537 U.S. 1193 (2003); Vietnamese Asylum Seekers v. Dept. of State, 104 F.3d 1349, 1353 (D.C. Cir. 1977); accord Milk Train, Inc. v. Veneman, 310 F.3d 747, 751 (D.C. Cir. 2002) (analyzing these factors without explicitly listing them).  In doing so, it is clear that the decision to approve or disapprove a license application is committed to the

discretion of the agency by law and, therefore, this Court lacks jurisdiction over plaintiff's APA claim.[14]

### A.    Statutory and Regulatory Framework

In analyzing the statutory and regulatory framework of the AECA and the ITAR, it is clear that there is no judicially manageable standard for a Court to analyze the decision to grant or deny a license to export defense articles and that the matter is one committed by law to the discretion of the agency.

The authority to issue licenses to export defense articles arises from the Arms Export Control Act.  See 22 U.S.C. § 2751 et seq.  In the AECA, Congress "authorize[d] sales [of defense articles] by the United States Government to friendly countries having sufficient wealth to maintain and equip their own military forces at adequate strength . . .."  22 U.S.C. § 2751. Congress further states that, "[i]t is the sense of the Congress that all such sales be approved only when they are consistent with the foreign policy interests of the United States."  Id.  Thus, under the AECA, Congress authorized the President to control the export and import of defense articles and defense services "[i]n furtherance of world peace and the security and foreign policy of the United States."  See 22 U.S.C. § 2778(a)(1).  Congress also specified that the Secretary of State shall be responsible for the continuous supervision and general direction of sales, leases, financing, cooperative projects, and exports under [the AECA]."  22 U.S.C. 2752(b).

The AECA further authorizes the President to exercise his discretion in denying a license to export defense articles if the President determines that an applicant for a license is the subject

---

[14]  The actual discretion provided to the agency by law belies plaintiff's claim that the granting of licenses to export defense articles is a "ministerial duty of a nondiscretionary nature." Compl. at ¶ 2.

of an indictment for the violations of certain specified statutes, if there is "reasonable cause" to believe that an applicant for a license has violated any of the specified statutes, or that an applicant is ineligible to contract with, or to receive a license or other form of authorization to import defense articles from any agency of the Government.  See 22 U.S.C. § 2778(g)(3).  Moreover, even where the AECA forbids the President from issuing a license to export to a person, it expressly provides to the President the authority to determine, in his discretion, and in consultation with the Secretary of the Treasury, that a license may issue.  Id. § 2778(g)(4)(B).

Pursuant to the AECA, the President delegated his authority to control certain aspects of the export of defense articles to the Secretary of State by Executive Order 11,958, as amended.[15]  See Exec. Order No. 11,958, 42 Fed. Reg. 15 (Jan. 24, 1988).  Likewise, the President delegated to the Secretary of State the authority to promulgate regulations regarding the export of defense articles.[16]  Id.  Pursuant to the President's delegation of authority, the Secretary of State

---

[15]  Congress clearly contemplated that the President would delegate this authority to the Secretary.  See 22 U.S.C.A. § 2791(2)(A) ("Each export license issued under section 2778 of this title shall provide that such license may be revoked, suspended, or amended by the Secretary of State, without prior notice, whenever the Secretary deems such action to be advisable.").

[16]  Section 38(a)(1) of the AECA provides that "In furtherance of world peace and security and foreign policy of the United States, the President is authorized to control the import and export of defense articles and defense services . . ..  The President is authorized to designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services."  22 U.S.C. § 2778(a)(1).  Section 38(b)(2) provides that "Except as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter."  22 U.S.C. 2778(b)(2 ).

13

promulgated regulations governing the exportation of defense articles as the International Traffic in Arms Regulations, 22 C.F.R. §§ 120-130.[17]

Statutes using language permitting the President or agency officials to take action if that official "deems" it in the "national interest" have been interpreted consistently to commit an action to the discretion of the agency. For example, the D.C. Circuit recently affirmed a dismissal of an APA case where the statute authorized the Attorney General to take certain actions when he "deem[ed]" such actions to be in the "national interest. See Zhu v. Gonzales, 411 F.3d 292, 295 (D.C. Cir. 2005) (when the statute states that the Attorney General "may" waive a requirement in the "national interest," such a decision calls upon his "expertise and judgment unfettered by any statutory standard whatsoever"). Similarly, when Congress authorized the Director of the Central Intelligence Agency to terminate an employee whenever he "shall deem such termination necessary or advisable in the interests of the United States," the United States Supreme Court has held that such language "fairly exudes deference" and, thereby, precludes judicial review under the APA. See Webster v. Doe, 411 U.S. 592, 600 (1988).

Similar to the afore-mentioned cases, the AECA expressly provides that the President, or his delegate, may approve the exportation of defense articles when he determines that such an action is "consistent with the foreign policy interests of the United States," 22 U.S.C. § 2751, and "[i]n furtherance of world peace and the security and foreign policy of the United States," 22 U.S.C. § 2778(a)(1). Additionally, Congress expressly authorized the Secretary of State to " revoke[], suspend[], or amend[]" an export license "without prior notice, ***whenever the Secretary***

---

[17] The Secretary of State further authorized the DDTC to implement the President's delegation. See 22 C.F.R. § 120. Thus, pursuant to these delegations, decisions regarding export licenses for defense articles are made by the DDTC.

***deems such action to be advisable***." 22 U.S.C. § 2791(2)(A) (emphasis added).  See also 22

C.F.R. § 127.6 (providing for the revocation, suspension or denial of any license on various

broad grounds, including whenever the State Department deems it advisable).  Thus, under the

AECA, Congress committed the decision to issue, deny, revoke, suspend or amend licenses for

the export of defense articles to the discretion of the President and his delegates, in this instance

the Secretary of State or her delegates.[18]

### B.    Nature of the Agency Decision

The nature of the agency decision regarding the exportation of defense articles is

decidedly one involving the foreign affairs and national security of the United States and,

therefore, not susceptible to review in Court.  Congress itself made this clear with its express

language:  "It is the sense of the Congress that all such sales be approved ***only*** when they are

***consistent with the foreign policy interests*** of the United States." 22 U.S.C. § 2751 (emphasis

added).  Moreover, as set forth previously, Congress expressly authorized the President to

"control" the export and import of defense articles or services "[i]n furtherance of world peace

and the security and foreign policy of the United States."  See 22 U.S.C. § 2778(a)(1).  As the

Court of Appeals for the Federal Circuit has held, "the broad statutory delegation in the AECA

incorporates 'the historical authority of the President in the fields of foreign commerce and the

importation into the country.'" B-West Imports, 75 F.3d at 636 (quoting South Puerto Rico

---

[18]  In fact, this precise statutory language has been held to be a grant of "broad authority" by Congress that should be "broadly construed."  See B-West Imports, Inc. v. United States, 75 F.3d 633, 636 (Fed. Cir. 1996) (when it authorized the President to "control" arms imports under the AECA, Congress authorized the President "not only to regulate arms importation through license systems, but also to prohibit particular importations altogether when the circumstances warrant.").  The same grant of broad authority applies to the President's delegated responsibility to "control" arms exports under the AECA.

Sugar Trading Corp. v. United States, 334 F.2d 622, 632 (Ct. Cl. 1964), cert denied, 379 U.S.

964 (1965)).  Accordingly, the B-West Imports Court found that the AECA's authority to

"control" should be broadly construed, and permits the President to "regulate, to exercise

restraining or directing over, or to curb."  Id.  (internal quotes omitted).

      The D.C. Circuit has repeatedly held that where, like here, the issue involves "judgments

on questions of foreign policy and national interest," that issue is not "fit for judicial

involvement," and, therefore, is not reviewable under the APA.  District No. 1, Pacific Coast

Dist., Marine Engineers' Beneficial Ass'n v. Maritime Admin., 215 F.3d 37, 42 (D.C. Cir.

2000); DKT Mem. Fund Ltd. v. Agency for Intern. Dev.,887 F.2d 275, 281-282 (D.C. Cir. 1989)

("where the President acted under a congressional grant of discretion as broadly worded as any

we are likely to see, and where the exercise of that discretion occurs in the area of foreign affairs,

we cannot disturb his decision simply because some might find it unwise . . ."); Legal Assistance

for Vietnamese Asylum Seekers v. Department of State, Bureau of Consular Affairs,104 F.3d

1349, 1353 (D.C. Cir. 1997) ("By long-standing tradition, courts have been wary of second-

guessing executive branch decisions involving complicated foreign policy matters.").  The nature

of the decision at issue in this case – the licensing of defense articles for export – undoubtedly

involves judgments on the foreign affairs and national security of the United States.  Thus, the

decision on such licenses is committed to the discretion of the agency by law and not susceptible

to review in Court under the APA, as there is no statutory standard by which to measure the

agency's actions.

III.    **EVEN IF THE COURT HAD JURISDICTION TO HEAR PLAINTIFF'S "DEBARMENT" CLAIM, THERE HAS BEEN NO FINAL AGENCY ACTION TO REVIEW**

Plaintiff seeks to end-run the jurisdictional hurdle it faces by asserting that the policy of denial by the State Department is a de facto debarment under the ITAR that can be reviewed as a final agency action. Nothing could be further from the truth.

Under the APA, a court can only exercise judicial review over a "final agency action for which there is no other adequate remedy in a court."[19] 5 U.S.C. § 704; see also FTC v. Standard Oil Co., 449 U.S. 232, 238(1980). In Bennett v. Spear, the Supreme Court explained that an agency action is final *only* if it meets two conditions: The first condition is that "the action must mark the consummation of the agency's decisionmaking process--it must not be of a merely tentative or interlocutory nature." 520 U.S. 154, 177-78 (1997); Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission, 324 F.3d 726, 731 (D.C. Cir.2003) (stating that the agency decision must be "definitive") (quoting Standard Oil Co., 449 U.S. at 239) (internal quotes omitted). The second condition, which overlaps closely with the requirements for ripeness, is that "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett, 520 U.S. at 177-78; Reliable Automatic Sprinkler Co., 324 F.3d at 731 (quoting Standard Oil Co., 449 U.S. at 239). In sum, an agency action is only final "to the extent that it imposes an obligation, denies a right, or fixes some legal

---

[19] Although a Court may also entertain an action challenging "agency action unlawfully withheld," see 5 U.S.C. § 706(1), such action is not appropriate here; as explained previously, plaintiff's pending applications were denied on March 10, 2006. Thus, there is no pending agency action that has been withheld. To the extent that the Court seeks to determine whether or not the delay was reasonable, the record of correspondence between the parties makes clear that the delay was necessary to obtain additional information from USO.

relationship." <u>Reliable Automatic Sprinkler Co.</u>, 324 F.3d at 731 (citing <u>Role Models Am., Inc.</u>

<u>v. White</u>, 317 F.3d 327, 331-32 (D.C. Cir. 2003)).

Once the State Department determined, pursuant to its authority under the AECA and the

ITAR, that there was reason to believe that plaintiff had violated the ITAR, the Department

exercised its discretion, suspended plaintiff's existing licenses, and imposed a policy of denial on

plaintiff's pending license applications subject to plaintiff requesting transaction exemptions.

Such action is clearly authorized by both the AECA and by the ITAR, and committed to the

discretion of the President and his delegates.  <u>See</u> 22 U.S.C. § 2791(2)(A) (authorizing the

Secretary of State to "revoke[], suspend[], or amend[]" an export license "without prior notice,

***whenever the Secretary deems such action to be advisable***.") (emphasis added); 22 C.F.R. §

126.7(a) (authorizing the Department of State to disapprove, revoke, suspend or amend without a

license without prior notice when, among other things, it deems such action to be "in furtherance

of world peace, the national security or the foreign policy of the United States, or is otherwise

advisable;" or it "believes" that certain regulations have been violated).  As explained

previously, the exercise of discretion to deny or approve a license to export defense articles is a

discretionary function that is committed by law to the discretion of the agency and, therefore,

non-reviewable under the APA.

This exercise of discretion to impose a policy of denial is separate and distinct from a

"debarment," which is authorized as a penalty for violations of the AECA and the ITAR once

there has been a formal administrative proceeding.  <u>See</u> 22 C.F.R. § 128.  Thus, to the extent that

plaintiff ***could be*** debarred from participating in exports of defense articles, such a debarment

has not been imposed as of now, and cannot be imposed until after the forthcoming

18

administrative charges are resolved through the appropriate proceedings under the ITAR. And,

until such time as the State Department has consummated its decisionmaking process, i.e.,

completed its administrative proceeding against plaintiff, and imposed appropriate penalties, if

any, there is *no* final agency action to review.[20]  Standard Oil, 449 U.S. 246-47 ("Because the

Commission's issuance of a complaint averring reason to believe that Socal has violated the Act

is not 'final agency action' under § 10(c) of the APA, it is not judicially reviewable before

administrative adjudication concludes."); Bennett, 520 U.S. at 177-78; Reliable Automatic

Sprinkler Co., 324 F.3d at 731.  Accordingly, plaintiff's claims regarding a de facto debarment

must be denied for lack of subject matter jurisdiction.

## IV.    PLAINTIFF IS NOT ENTITLED TO A DECLARATORY JUDGMENT THAT IT IS IN COMPLIANCE WITH THE ITAR OR MANDAMUS TO ORDER THE STATE DEPARTMENT TO APPROVE LICENSES

In addition to requesting review under the APA, plaintiff requests that this Court provide

it the extraordinary relief of ordering the State Department to approve its license applications

and issuing a declaratory judgment that "plaintiff is in full compliance with the ITAR."  Compl.

---

[20]    Plaintiff's complaint asserts that the action arises under, among other things, the "Fifth Amendment to the Constitution of the United States," Compl. at ¶ 2, but there is no further mention of a Constitutional Claim in the complaint.  To the extent that plaintiff intends to state a Fifth Amendment Due Process claim, the complaint fails to state a proper claim.  If plaintiff seeks to state a Due Process claim by alleging that the State Department had no right to cancel and suspend its licenses, such a claim fails as a matter of law.  See 22 U.S.C. § 2791(2)(A) (authorizing the Secretary of State to "revoke[], suspend[], or amend[]" an export license "without prior notice, *whenever the Secretary deems such action to be advisable*.") (emphasis added); B-West Imports, 75 F.3d at 638.  To the extent plaintiff alleges that it has been debarred without due process, such a claim is not ripe – plaintiff has not been debarred and is entitled to due process in the course of the forthcoming administrative proceeding pursuant to Section 128 of the ITAR.  Until such time as the forthcoming administrative proceeding is complete, and it is determined in that proceeding that penalties are appropriate, there is no penalty against USO requiring due process.

at p.7.  In effect, plaintiff requests that this Court usurp the authority and power of the Executive Branch.  As explained in detail previously, the decision to issue or not issue a license to export defense articles is committed to the discretion of the Executive Branch by law.  Thus, this Court has no jurisdiction to order the State Department to approve plaintiff's license applications.[21]  Moreover, because the determination that a party is in compliance with the ITAR is also left to the discretion of the State Department, this Court may not enter a declaratory judgment that plaintiff is in compliance with the ITAR.[22]  Peoples v. U.S. Dept. of Agriculture, 427 F.2d 561, 565 n.9 (D.C. Cir. 1970) ("Of course any lawsuit challenging the validity of an administrative or executive action, whether the relief sought is mandamus, injunction, mandatory injunction or declaratory judgment, is limited by the supervening doctrine that a court cannot by its order trespass into the domain of discretion entrusted by the legislature to the official or agency involved.").

### CONCLUSION

For the foregoing reasons, plaintiff's claims should be dismissed in their entirety for lack of subject matter jurisdiction.

---

[21]  As explained previously, on March 10, 2006, the State Department exercised its discretion and denied plaintiff's pending license applications.

[22]  Such a declaratory judgment would also end-run the final agency action requirement of the APA, as a party subject to an administrative action could simply ignore that action and go to Federal Court to seek a declaratory judgment regarding its status, thereby litigating the merits of the administrative action in Federal Court.

March 23, 2006                          Respectfully submitted,


_____/s/_____
KENNETH L. WAINSTEIN, DC BAR #451058
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC BAR #434122
Assistant United States Attorney


_____/s/_____
JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
555 Fourth Street, N.W. - Civil Division
Washington, D.C.  20530
(202) 307-1249
(202) 514-8780 (facsimile)