# U.S. ORDNANCE, INC.

2500 Valley Road, Ste Z
Reno, NV 89512

Phone: 775-356-2380
Fax: 775-356-2388

Email: info@usord.com    Web: www.usord.com

---

June 21, 2004

# BY HAND DELIVERY

Ms. Deborah Carroll
Chief
Enforcement Division
U.S. Department of State
Bureau of Political-Military Affairs
Directorate of Defense Trade Controls
Washington, D.C. 20520-0112

    RE: DTC Case No. RR 04-118

Dear Ms. Carroll:

    This is in response to your letter dated June 2, 2004, regarding U.S. Ordnance and its former employee, Curtis Lynn Debord.[1] Pursuant to your request, following is a full report explaining the role Mr. Debord, Sr. played in U.S. Ordnance, prior to his separation on June 1, 2004. U.S. Ordnance is providing this report pursuant to instructions from the Directorate of Defense Trade Controls ("Directorate"), and not because U.S. Ordnance believes it should make a voluntary disclosure under § 127.12 of the International Traffic in Arms Regulations ("ITAR"). U.S. Ordnance refutes and protests any implication that this report is provided in connection with a possible violation committed by U.S. Ordnance.

    Under the Freedom of Information Act, all providers of information to which source information is attributable in this submission hereby assert their right to have such information exempted from disclosure to third parties pursuant to applicable provisions of the Act, 5 U.S.C. § 522 (b)(3); (b)(4); (b)(6). Additionally, they further assert their rights under applicable provisions of the Privacy Act, 5 U.S.C. § 552(a), and applicable provisions of the Internal Revenue Code to protect personal and taxpayer information from disclosure to third parties.

    Curtis Debord, Sr.'s individual ineligibility, in connection with Case No. 97-00239-MMC pending in the United States District Court for the Northern District of California and 22 C.F.R. § 120.1(c), should not taint the lawful export activities of U.S. Ordnance. Mr. Debord, Sr. played no role in establishing U.S. Ordnance, he never financially invested in the company, nor did he ever participate in any export or brokering activities. The following information demonstrates that Mr. Debord, Sr. was simply an employee of U.S. Ordnance, and he did not receive any direct or indirect benefits from his employment beyond just compensation.

## A. FORMATION OF U.S. ORDNANCE

    In 1993 Curtis Debord, Jr. started American Arms/Delta in Reno, Nevada. The business was first involved in manufacturing machine guns for the motion picture industry, but evolved into the manufacture of commercial firearms for the collectors' market. U.S. Ordnance was incorporated in the State of Nevada by Curtis Debord, Jr. on July 28, 1997 (see Attachment A) for the purpose of taking over the

---

[1] Curtis Lynn Debord is the father of Curtis Lee Debord, President of U.S. Ordnance. For purposes of clarification, Curtis Lynn Debord will hereinafter be referred to as Curtis Debord, Sr. or Mr. Debord, Sr. Curtis Lee Debord will hereinafter be referred to as Curtis Debord, Jr. or Mr. Debord, Jr.

manufacturing of commercial collector-grade firearms from American Arms/Delta. At the time of incorporation, Mr. Debord, Jr.'s attorney, Steven F. Stucker, briefly held the position of initial director of the company, as well as all officer positions (see Attachment B). On September 10, 1997, less than two months after incorporation, Mr. Debord, Jr. became the sole director of the company, and was elected to all officer positions (see Attachment C). As evidenced by the reports filed annually with the State of Nevada, Mr. Debord, Jr. has retained the position of director, and all officer positions in the company since September 10, 1997 (see Attachment D). At no time has Mr. Debord, Sr. ever served as director of U.S. Ordnance, or held any officer positions of the company, and therefore has never played any part in the company's business management decisions. In fact, Mr. Debord, Sr.'s employment as a Sales and Marketing Manager did not commence until 2000. Prior to this, Mr. Debord, Sr. was not involved with any of the daily operations of U.S. Ordnance, nor did he contribute to its business strategy. **Mr. Debord, Sr. clearly had no role in establishing U.S. Ordnance.**

### B. U.S. ORDNANCE GROWTH AND EMPLOYMENT OF MR. DEBORD, SR.

In 2000, U.S. Ordnance experienced significant growth in demand for its products. In connection with a SACO Defense licensing agreement, U.S. Ordnance became the exclusive manufacturer and sole distributor for all models of the M60 Series machine gun and spare parts. This agreement established U.S. Ordnance as the sole source for M60 machine guns for the U.S. Government, in support of FMS sales, and foreign entities. Because the M60 machine gun is largely utilized in foreign markets, these markets were primarily targeted as part of U.S. Ordnance's business model. However, even with a significant amount of foreign sales, the United States military remains U.S. Ordnance's second largest customer. Due to the ensuing demand for U.S. Ordnance products, U.S. Ordnance needed to hire new employees to support its efforts. U.S. Ordnance sought Mr. Debord, Sr.'s assistance on a part-time basis to assist the company's sales and marketing efforts. Mr. Debord, Sr. did not pursue this employment. Rather, U.S. Ordnance sought to hire employees, like Mr. Debord, Sr., who were highly qualified to further its sales and marketing efforts. Additionally, U.S. Ordnance targeted foreign markets not because of any suggestion by Mr. Debord, Sr., but because it was wholly in accordance with its business strategy, and the nature of the M60's role as a first line machine gun for non-NATO forces. Finally, pursuant to 22 U.S.C. § 2778(b), as a manufacturer of defense articles U.S. Ordnance was <u>required</u> to register with the Department of State as an exporter, regardless of whether U.S. Ordnance ever intended to export products or not.

Between 2000 and 2003, as a result of an aggressive marketing campaign and its qualified salespeople, U.S. Ordnance experienced tremendous growth in the number of trade shows and demonstrations it attended. This increase in business required Mr. Debord, Sr.'s full-time employment with U.S. Ordnance beginning in January 2003. Again, it was U.S. Ordnance who sought Mr. Debord, Sr.'s increased time commitment, it was not a change requested by Mr. Debord, Sr.

### C. MR. DEBORD, SR.'S EMPLOYMENT DESCRIPTION AND DUTIES

U.S. Ordnance employed Mr. Debord, Sr. to utilize his knowledge of firearms, and his efficacy as a salesman. As a Sales and Marketing Manager, Mr. Debord, Sr.'s main responsibilities included traveling to tradeshows world-wide to present U.S. Ordnance products, identifying business opportunities in commercial, governmental, and defense markets, and presenting product information while another member of the U.S. Ordnance sales and marketing team conducted demonstrations for U.S. and foreign military entities (see Attachment E). The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the Department of Justice ("DOJ") were fully aware that Mr. Debord, Sr. was present while firearms were being demonstrated to potential or existing clients. Neither ATF nor DOJ had any problem with this arrangement as long as firearms were not transferred to Mr. Debord, Sr. Because his job responsibilities required him to travel a substantial amount of the time, on average Mr. Debord, Sr. was only present at the U.S. Ordnance worksite 15-20 hours a week. U.S. Ordnance never tried to conceal Mr. Debord, Sr.'s employment or his related duties, because there was nothing unlawful involved. In fact, Mr. Debord, Sr. was allowed to receive a passport in order to carry out his responsibilities as a Sales and Marketing Manager.

While not traveling, Mr. Debord, Sr. had a very limited role (primarily technical manufacturing advice) at U.S. Ordnance, beyond attending sales and safety meetings. Additionally, since 1978, Mr. Debord, Sr. has owned and operated his own company, which is and has been wholly separate from U.S.

Ordnance. Mr. Debord, Sr. has continued to operate and derive income from this business. With this source of income, Mr. Debord, Sr. did not need employment with U.S. Ordnance, but agreed to assist his son with his expanding business. Until 2003, U.S. Ordnance received the benefit of Mr. Debord, Sr.'s services and expertise without providing him with any financial compensation in return.

**D. COMPENSATION**

The terms of Mr. Debord, Sr.'s Employment Agreement, dated July 30, 2000, provided for a salary of $1,000 per week, plus five percent of the gross sales of U.S. Ordnance, provided that Mr. Debord, Sr. increased the gross sales to an amount in excess of $1 million annually (see Attachment F). As evidenced by the attached documentation, this compensation was well below market average (see Attachment G). The terms also acknowledged that because U.S. Ordnance was in a "cash-poor" situation at the time, Mr. Debord, Sr. would defer both his salary and the sales incentive bonus. This financial arrangement with U.S. Ordnance was not unique to Mr. Debord, Sr. Curtis Debord, Jr., President and CEO, and Norman Justice, a manufacturing engineer who had previously been the Chief Manufacturing Engineer on the M60 machine gun for SACO Defense, also agreed to defer receiving compensation until U.S. Ordnance became more profitable. From 1998 through 2001, U.S. Ordnance experienced net losses, and generated only a negligible net income in 2002 (see Attachment H). As a result, Mr. Debord, Sr. did not receive compensation, and Mr. Debord, Jr. and Mr. Justice received salaries far below the average market salary (see Attachment I).

Due to U.S. Ordnance's increased production and profitability in 2003, Mr. Debord, Sr. received his stated salary of $1,000 per week from January 2003 through his separation on June 1, 2004. Additionally, pursuant to the advice of Sidley & Associates, an independent accounting firm, at the end of December 2003 U.S. Ordnance paid Mr. Debord, Sr. the compensation that was due him in connection with the terms of his Employment Agreement. Mr. Debord, Sr. earned a salary of $22,000 in 2000, and $52,000 yearly from 2001 through 2003, for a total outstanding balance of $178,000. He was also entitled to five percent of the gross sales in excess of $1 million annually. This amounted to $135,849 in 2001, $239,128 in 2002, and $527,217 in 2003. The attached Analysis of Salary and Bonus to Curtis Debord, Sr. provides further detail and evidences that the money owed to Mr. Debord, Sr. through 2003 totaled $1,080,194 (see Attachment J). At the end of December 2003, U.S. Ordnance paid Mr. Debord, Sr. $1,048,000, and still owes him the balance of $32,194. This payment was money due and owing Mr. Debord, Sr. and, pursuant to the advice of Sidley & Associates, was paid as soon as U.S. Ordnance could feasibly do so. This payment was solely based on the compensation due Mr. Debord, Sr. for the lawful work he performed for U.S. Ordnance as a Sales and Marketing Manager. U.S. Ordnance was advised by Sidley & Associates to pay all of its employees who were owed compensation. This payment was therefore not a payment unique to Mr. Debord, Sr. Comparable payments were also made to Mr. Debord, Jr. and Mr. Justice to pay the money that was also due them as a result of deferring or receiving below market average salaries. Upon request, further information can be provided by Sidley & Associates.

While U.S. Ordnance did increase its profitability during 2003, it also expected to generate further income in connection with its planned exports to the Colombian Army under Plan Colombia, a U.S. initiative. U.S. Ordnance exhausted much of its resources in building the weapons it had contracted to ship to Colombia, <u>but was not able to fulfill its obligations and receive payment because the necessary licenses have not been received from the Office of Defense Trade Controls ("DTC")</u>. One of the three licenses at issue was applied for as early as October 21, 2003. Due to additional requests for information from the State Department, Congressional notification, and the current review by DTC, U.S. Ordnance has been waiting for at least one Colombian license for almost eight months. As a result, U.S. Ordnance was forced to borrow $500,000 from Curtis Debord, Sr., $500,000 from Curtis Debord, Jr. and $500,000 from U.S. Bank to continue its daily operations. Without these loans, U.S. Ordnance would have had to suspend its operations, to the detriment of the company and all of its employees, and to the efficacy of Plan Colombia insofar as the weapons it had planned to export to the Colombian military were part of Plan Colombia.

The terms of Mr. Debord, Jr.'s and Mr. Debord, Sr.'s promissory notes require U.S. Ordnance to repay the principal, and six percent interest, to the lenders on or before December 30, 2004, with no monthly payments required (see Attachment K). No remuneration, with the exception of the payment of principal and interest, is involved in the repayment of the loan to Mr. Debord, Sr. The transaction was

required solely because U.S. Ordnance has not received the permits from DTC necessary to export weapons to the Colombian Army. The loan was, however, lawful and Mr. Debord, Sr. is currently a creditor of U.S. Ordnance similar to any other lending entity. If required by DTC, U.S. Ordnance will divest itself of the debt to Mr. Debord, Sr. in order to proceed with its Colombian transactions, and all other exporting activities.

U.S. Ordnance protests any implication that the loan from Mr. Debord, Sr. is an improper investment in U.S. Ordnance, but will comply with DTC's requirements in order to continue its status as a reliable defense trade partner. U.S. Ordnance greatly desires to repay the loans from both Mr. Debord, Sr. and Mr. Debord, Jr. but has been prevented from doing so because of its current financial situation. The aggregate $1.5 million U.S. Ordnance borrowed from Mr. Debord, Jr., Mr. Debord, Sr. and U.S. Bank has been almost entirely exhausted and the company cannot continue its daily operations for much longer without the ability to fulfill its obligations under its contracts. Approval of pending licenses will allow U.S. Ordnance to simultaneously further the goals of the United States under Plan Colombia and generate enough income to repay its debts and remain financially viable.

Finally, Mr. Debord, Sr. has never owned an equity interest in U.S. Ordnance. Of the 25,000,000 authorized shares of U.S. Ordnance Common Stock, 1,000,000 shares were issued to Curtis Debord, Jr. on September 10, 1997 (see Attachment L). The attached copy of Stock Certificate Number 1 represents all of U.S. Ordnance's issued and outstanding shares (see Attachment M). Consequently, Mr. Debord, Jr. is the only person who has an equity investment in U.S. Ordnance, and who has received stock dividends from share ownership. Mr. Debord, Sr. never financially invested in U.S. Ordnance.

## E. EXPORT AND BROKERING ACTIVITIES

The compensation Mr. Debord, Sr. did receive was for his service solely to the Sales and Marketing Department. All other U.S. Ordnance business affairs, including export activities, were handled by other U.S. Ordnance employees (see Attachment N). Typically, Mr. Debord, Sr. met with clients to present and discuss products that are available from U.S. Ordnance. Mr. Norman Justice was responsible for providing cost estimates and quotes to clients, and for identifying key business sectors prior to January 1, 2004, and this role was assumed by Mr. Steve Helzer after that date. The resulting price is then confirmed with Curtis Debord, Jr., Mr. Dan Fassler, Production Manager, and Steve Helzer, Marketing Manager. The offer that is ultimately submitted to the potential client is prepared by Mr. Helzer and approved and signed by Mr. Debord, Jr. Currently, forms associated with this process, such as the formal offer and export license applications, are prepared by Messrs. Helzer, Justice, and Debord, Jr. Prior to November 2003, FD and Associates, a law firm located in McLean, Virginia, handled license forms and their submission on behalf of U.S. Ordnance. Mr. Debord, Sr.'s responsibilities were limited to representing the company and presenting its products to potential or existing clients, but his function ended after such a presentation. He, therefore, never participated in the company's export activities.

Similarly, Mr. Debord, Sr. never had any role in any brokering activities performed by U.S. Ordnance. U.S. Ordnance is registered with DTC as a manufacturer of Defense Articles, and all of its export licenses are under PMDTC Registration Code: M1429. Mr. Debord, Sr. never functioned in a brokering capacity, as defined in § 129.2 of the ITAR. While Mr. Debord, Sr. did meet with clients to present products, he did so in his capacity as an employee of U.S. Ordnance, not as an agent. Furthermore, Mr. Debord, Sr. never acted as an agent for any third party conducting business with U.S. Ordnance, nor did he ever receive any form of compensation from any third party for such conduct.

The compensation Mr. Debord, Sr. did receive was a result of the total U.S. Ordnance sales, <u>regardless of whether they were foreign or domestic</u>. If a substantial amount of sales were indeed foreign, it was pursuant to the goals of U.S. Ordnance, not any of its individual employees. At the end of the fiscal year, all sales were calculated, and an incentive bonus was paid (or deferred) to Mr. Debord, Sr. equal to five percent of the total sales over $1 million. This compensation was due Mr. Debord, Sr. in accordance with his Employment Agreement, and was not dependent on any foreign export activities performed by U.S. Ordnance. Also, the bonus compensation structure was comparable to that paid to other employees, who had similar responsibilities. For example, Mr. Norman Justice receives the sum of three percent on all sales of M60 machine guns and spare parts. This compensation is paid regardless of whether the sales are to foreign or domestic entities. The amount of Mr. Debord, Sr.'s compensation was determined by his success as a salesman, but was not dependent solely on the exports of U.S. Ordnance.

Additionally, because Mr. Debord, Sr. is separated from U.S. Ordnance, he will not receive any further compensation based on the sales related to U.S. Ordnance's pending licenses. He will receive no direct or indirect benefit from the approval of the Colombian licenses or any other pending licenses.

While performing a thorough review of the above export activities, U.S. Ordnance's counsel drew to our attention that the commission paid to the company's routine registered agent in Colombia had not been reported pursuant to the requirements of 22 C.F.R. § 130.9. This omission was inadvertent. U.S. Ordnance acquired the registered agent as a result of the April 2000 licensing agreement with SACO Defense. U.S. Ordnance subsequently followed the licensing routine established by SACO Defense, and believed that the intent of § 130.9 was to prevent foreign corruption and did not apply to routinely utilized overseas registered agents. Following an established routine is no excuse for not properly disclosing required information, and U.S. Ordnance is researching the matter thoroughly. In each transaction a negotiated fee or commission was paid to the same individual, who also represents other established U.S. and foreign companies in Colombia. U.S. Ordnance and Curtis Debord, Sr. have no financial investment in or any relationship to the agent or his firm whatsoever. It is simply a professional services relationship. This agent had been performing the same work for SACO Defense previously, as well as other U.S. companies. We are presently reviewing all documents related to these transactions and will provide the Office of Defense Trade Controls Compliance a full and accurate report of the precise amount of these commissions in accordance with the guidelines set out in 22 C.F.R. § 130.10.

U.S. Ordnance regrets its oversight in failing to include this information when it submitted previous license applications, and we are providing further training and instruction to our staff so there is a clearer understanding of our general reporting obligations, and those required when omissions are involved that are within the scope and definition of Part 130 requirements. U.S. Ordnance will conduct a thorough review of this matter and will ensure that it is not repeated. Following the guidelines of 22 C.F.R. § 127.12, the company will provide the Office of Defense Trade Controls Compliance with a complete report within sixty (60) days of the date of this letter, unless we receive other guidance or instruction from you. With regard to any pending licenses, we will contact the Office of Defense Trade Controls Licensing in the next several days to provide any supplemental or updated information that they may require to complete their review.

## F. CONCLUSION

In summary, the financial benefits Mr. Debord, Sr. received from U.S. Ordnance were akin to the benefits any person similarly employed would receive. His employment with U.S. Ordnance was not sought by him, but was at the request of U.S. Ordnance. The ongoing indictment in Case No. 97-00239-MMC in no way barred Mr. Debord, Sr. from employment, and as an employee he was entitled to financial compensation. He deferred payment of his modest salary and total compensation until U.S. Ordnance was financially viable, and then received the compensation due him. A significant amount of U.S. Ordnance's sales were made to foreign entities because that was in accordance with the intended market for U.S. Ordnance's products as based on the product itself. All transactions were direct commercial sales, and many received support from the U.S. Government.

As explained in our Transaction Exception Request submitted to your office on June 8, 2004 (see Attachment O), three of U.S. Ordnance's pending licenses are pursuant to Plan Colombia, an important U.S. initiative. The U.S. cannot succeed in assisting countries like Colombia without the equipment supplied by companies like U.S. Ordnance. As the exclusive manufacturer and sole distributor of all models of the M60 Series machine gun, U.S. Ordnance is uniquely qualified to provide support to the U.S. Government's goals in Colombia. Without DTC approval for these licenses, U.S. foreign policy is undermined and the Colombian anti-narcotics and anti-terrorism missions are seriously compromised. U.S. Ordnance is a reliable defense trade partner with a clean export record, and wishes to fulfill its obligations to the Colombian Government without further delay.

Not only are U.S. Ordnance products important to Colombia and the foreign market, but the U.S. military remains the company's second largest customer. If U.S. Ordnance does not receive its export licenses the company will be forced to shut down. This will affect not only foreign customers, but will also have a serious impact on our domestic armed forces. U.S. Ordnance has always been proud to assist the United States Government and military in whatever capacity possible, and wishes to continue to do so. U.S. Ordnance has always been willing to work with the Office of Defense Trade Controls, and any other

government agency, in order to support our country's goals both at home and abroad. U.S. Ordnance should not be penalized for a lawful relationship with a former employee, and requests an immediate restoration of its good standing with DTC.

This whole matter has put in serious jeopardy the company's ability to stay open and provide jobs to approximately twenty-five employees in the Reno, Nevada area.

If you have any further questions, please contact me at (775) 356-2380, or our Washington Counsel, Mark Barnes, at (202) 626-0070.

Respectfully Yours,

Curtis Debord, Jr.
President, U.S. Ordnance, Inc.

cc:  Mark Barnes
     Bob Barr