# Robert E. Sanders

*Attorney and Counselor at Law*

P.O. Box 25385

*Winston-Salem, NC 27114*

Robert E. Sanders, Esquire
Member District of Columbia Bar
Member Illinois Bar

telephone (336) 659-2999
facsimile (336) 659-2266

September 9, 2005

The Honorable Rose M. Likins
Assistant Secretary of State
Bureau of Political-Military Affairs
United States Department of State
2201 "C" Street Northwest
Washington, D.C. 20520

RE:      PETITION FOR REMISSION OR MITIGATION OF *DE
         FACTO* DEBARMENT: U.S. ORDNANCE, RENO, NV

Dear Madam Secretary:

Enclosed, please find the original and a courtesy copy of Petition for Remission or
Mitigation of *De Facto* Debarment and Memorandum of Points and Authorities in Support
thereof.

I have taken the liberty of providing an information copy to Inspector General Krongard
for whatever action he deems appropriate. The subject matter of this petition alleges acts and
omissions by a senior official of the Department of State and because the nature of the conduct
constitutes potential, waste, fraud, mismanagement, or abuse in that it involves *ultra vires*
deprivations of fundamental due process safeguards mandated by statute and regulation.

If I can be of aid in any way, please let me know. I am available to answer any questions
or provide any additional information that you or members of your staff may require. Please do
not hesitate to call or write me.

Sincerely,

Robert E. Sanders

RES/ag
Enclosures:    as stated
cc:      Honorable Harry Reid, United States Senate (NV)

Honorable John Ensign, United States Senate (NV)
Honorable Larry E. Craig, United States Senate (ID)
Honorable Charles E. Grassley, United States Senate (IA)
Honorable James A. Gibbons, United States House of Representatives (NV)
Honorable Doc Hastings, United States House of Representatives (WA)
Honorable Marilyn Musgrave, United States House of Representatives (CO)
Honorable Bob Barr, Former Member, United States House of Representatives
(GA)
Honorable Howard J. Krongard, Inspector General - U.S. Department of State
U.S. Ordnance
David C. Trimble

# TABLE OF CONTENTS

PETITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . 1

   SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      A.   DEBARMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      B.   ADMINISTRATIVE DEBARMENT . . . . . . . . . . . . . . . . 20

      C.   DEBARMENT NOT AUTHORIZED . . . . . . . . . . . . . . . . 21

   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# LIST OF EXHIBITS

**EXHIBIT #**          **DESCRIPTION**

1.    Contract of employment between U.S. Ordnance and Curtis Lynn Debord (Debord Senior) dated July 30, 2000;

2.    Stipulation modifying conditions of pre-trial release of Debord Senior dated November 17, 2000;

3.    Letter dated May 25, 2004 from U.S. Ordnance to Defense Trade Controls;

4.    Letter dated June 2, 2004 from Defense Trade Controls to U.S. Ordnance;

5.    Letter dated June 21, 2004 from U.S. Ordnance to Defense Trade Controls;

6.    Letter dated June 24, 2004 from Defense Trade Controls to U.S. Ordnance;

7.    Letter dated July 9, 2004 from Defense Trade Controls to U.S. Ordnance;

8.    Draft Charging Letter (undated) and fax transmittal sheet dated April 14, 2005 from Defense Trade Controls to U.S. Ordnance;

9.    E-mail message dated May 26, 2005 from Defense Trade Controls to U.S. Ordnance;

10.   Letter dated July 9, 2004 from Counsel for U.S. Ordnance to Defense Trade Controls.

-ii-

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF THE PETITION OF U.S. ORDNANCE
## FOR REMISSION OR MITIGATION OF
## *DE FACTO* DEBARMENT

### SUMMARY OF THE ARGUMENT

U.S. Ordnance Corporation (hereafter U.S. Ordnance) is a small business,

incorporated in the State of Nevada and is the employer to a modest number of

Nevada residents. It is licensed to manufacture firearms, including machine guns

and is registered with the United States Department of State's Office of Defense

Trade Controls. The marque product of U.S. Ordnance is the M60 series of

machine guns. U.S. Ordnance is in the prestigious position of being the sole source

of M60 machine guns and spare parts for the U.S. military and our foreign allies.

David C. Trimble is the Director of Defense Trade Controls (DTC), the sub-

organization within State that is responsible for administering the Arms Export

Control Act (AECA), 22 U.S.C. 2751 *et seq.* Over the past 14 months, since on or

about the second quarter of calendar year 2004, Director Trimble and other known

and unknown employees of the Department of State abruptly stopped processing

the applications for licenses of U.S. Ordnance to export defense articles and

*SUSPEDED* all export licenses which DTC had issued. It is apparent that no relief is

in sight and that U.S. Ordnance cannot continue in the operations for which it was

created: the manufacture of products vital to national security interests of the

United States.

Director Trimble's acts, if permitted to continue, will eliminate the sole

source of a specific type of military weapon for which there is a continuing national

defense need for the U.S. military and the country's national defense and at the

same time will cause the demise of an American small business.  Further, his

actions:

> 1.  Are prejudicial in view of the fact that processing of export license
> applications has been terminated by Director Trimble at the same time that
> processing continues for other registrants;
>
> 2.  Appear to be tainted by a legal matter totally unrelated to U.S. Ordnance
> as a business entity. (Rather, they appear to be based on the circumstances of
> an individual who is not an officer of the corporation but an "at-will"
> employee); and,
>
> 3.  Exceed the scope and authorities of his office with particular regard to
> debarment procedures spelled out in the regulations, 22 C.F.R. 120 - 130.

In short, Director Trimble's actions are *ultra vires*; they are well beyond the

scope of authority granted or delegated and are therefore unlawful. On the one

hand, punishment for violations of the AECA and its implementing regulations **are**

authorized by statute, 22 U.S.C. 2751 *et al.*, the AECA and by regulation, 22

C.F.R. 120 - 130, the International Traffic in Arms Regulation (ITAR). On the

other hand, the authority to initiate proceedings is narrowly drawn; the authority to

decide issues of fact and law and to impose a just punishment is

2

expressly and specifically delegated to the Assistant Secretary for Political-Military Affairs, (see ITAR § 127.7). Lest there be any dispute about the use of the term *de facto* debarment to describe the punishment that was imposed, the suspension of U.S. Ordnance for fourteen months and the invalidation of its licenses by Director Trimble is by no means an "interim"[1] measure.

Most relevant to the subject of this memorandum, the prohibitions and penalties of debarment may be imposed only after **prior** compliance with the fundamental due process rights guaranteed in ITAR § 128.1. Thus, each license suspension and each failure to process an export application is an unlawful act in that it is *ultra vires* – beyond the scope of authority granted or delegated to Director Trimble . The impact of these unlawful acts continues to be devastating to U.S. Ordnance:

— $4,775,321.00 in revenue lost due to cancelled contracts, forfeited performance bonds, costs, etc. in Colombia, Thailand, the Sultanate of Oman;

— $4,669,398.00 in potential lost revenue;

---

[1] The Director, Defense Trade Controls is authorized to order "interim suspension," prohibiting a person from participating in the export of defense articles, upon a finding that he or she believes that 1) grounds for debarment exist and a finding that interim suspension is necessary to protect world peace or the security of foreign policy of the United States. However, the punishment of "interim suspension" requires an order stating the grounds for its issuance, it may not exceed sixty (60) days, and the subject of the "interim suspension" is guaranteed the right to petition the Under Secretary of State for International Security Affairs. (ITAR § 127.12)

3

   —    deprivation to U.S. Ordnance of any ability to participate in governmental procurement processes; since absent export applications, products can not be demonstrated or otherwise evaluated by prospective customers; and,

   —    incalculable losses attributable to U.S. Ordnance's ineligibility to attend trade shows because Director Trimble persists in his refusal to process export applications. U.S. Ordnance has confirmed the loss of $30,000.00 in non-refundable booth space fees associated with the Eurosatory Show in France and the IDEX 2005 show in Abu Dhabi. Over and above these, however, is lost business opportunities in the millions.

## FACTS

1. Curtis Lee Debord [2] (hereafter, Debord Junior) is the current President, Treasurer, Secretary, sole director and sole owner of U.S. Ordnance shares of stock. His first involvement in the firearms business began in 1993 when he, as an individual, obtained a Federal Firearms License (FFL), trading as American Arms/Delta in Reno, Nevada. The business plan of American Arms/Delta called for the supply of firearms to the motion picture industry but soon expanded to collectibles for the curio and relic market. Under the leadership of Debord Junior, American Arms/Delta established an excellent relationship and compliance record with the Bureau of Alcohol, Tobacco and Firearms (ATF). American Arms/Delta

---

[2] Curtis Lee Debord is the son of Curtis Lynn Debord. Solely for purposes of clarity in this memorandum, Curtis Lee Debord will hereafter be referred to as Debord Junior. Curtis Lynn Debord will hereafter be referred to as Debord Senior.

had no involvement in the importing or exporting of firearms or ammunition. U.S. Ordnance was incorporated on July 28, 1997, under the laws of the State of Nevada to succeed American Arms/Delta. The incorporating Nevada attorney occupied the office of director and all other officer positions within the new corporation until September 10, 1997, when Debord Junior was elected to all officer positions pursuant to Nevada law. There has been no change in the corporate structure of U.S. Ordnance since.

2. Debord Junior's father, Curtis Lynn Debord (hereafter Debord Senior.) had no involvement in the formation of U.S. Ordnance or its predecessor company and never held a position which required either of the licensed companies to declare him a "responsible person" for purposes of the Federal firearms laws.

3. Under the leadership of Debord Junior, U.S. Ordnance was successful; demand for its products grew rapidly; and a cooperative spirit, built on a firm commitment to voluntary compliance, developed between the small business and the multiple agencies regulating it, particularly with the Departments of State and Defense. The applications of U.S. Ordnance for export licenses and other requests requiring approvals for the small business were given fair, equal, efficient and friendly treatment. Pursuant to a licensing agreement with SACO Defense, U.S. Ordnance became the exclusive manufacturer and sole distributor for all models of

the M60 machine gun and spare parts. The same agreement also established U.S. Ordnance as the sole source of M60 machine guns for the U.S. Government in support of Foreign Military Sales Program (FMS) and other military assistance programs. U.S. Ordnance at the same time mounted an aggressive marketing strategy, targeting military units of allied, non FMS participating nations. The response and corresponding demand for its products was unprecedented and was accomplished without compromise to the integrity of the products.

4. Totally separate and apart from Debord Junior or his firm, U.S. Ordnance, on August 12, 1997, a San Francisco Grand Jury returned a one count indictment against Debord Senior in CR 97-0239. The indictment alleged a single count conspiracy to violate provisions of the AECA, 22 U.S.C. 2778. To say that the indictment had a strange and unusual history is an understatement. Debord Senior awaited trial for almost eight years while the government delayed prosecution. During that time, the prosecution superseded the indictment twice, in 1998 and in 2001. The first superseding indictment added thirteen (13) substantive counts to the original conspiracy charge. The second superseding grand jury omitted one of the substantive counts which had been added in 1998. Next, in 2002, the judge granted the government's motion, dismissing seven (7) more of the substantive charges which had been added in 1998, on grounds of insufficient evidence.

6

Finally, in June 2005, all remaining charges against Debord Senior were dismissed with prejudice by the Honorable Fern Smith, United States District Judge. The procedural history of the criminal case against Debord Senior can be summarized as follows:

— In August 1997, a government prosecutor presented evidence regarding conduct between June 1995 and May 1997, resulting in a grand jury finding of probable cause and a one count indictment of Debord Senior for the offense of conspiracy;

— In November 1998, a government prosecutor presented evidence of conduct during the same period resulting in a grand jury finding of probable cause and a superseding indictment adding thirteen (13) substantive counts;

— In 2001, a government prosecutor presented evidence of conduct during the same period resulting in a second superseding indictment, omitting one of the substantive counts which had been added in 1998;

— In 2002, one year later, the Court granted the motion of a government prosecutor to dismiss seven (7) of the remaining substantive counts on grounds of insufficient evidence;

— In June 2005, the Court entered a final Order dismissing all remaining counts against Debord Senior with prejudice.

5.  During the extremely protracted duration of the indictment, Debord Senior was under the strict scrutiny of the Court. He was not incarcerated for any period, but the conditions of his pre-trial release set by the Court called for him to be under the direct supervision of a United States District Judge. Debord Senior attended all court appearances; he complied with all travel restrictions and with all

7

conditions relating to residency, employment, associations, and family activities among other conditions set by the Court. Debord Senior's activities were monitored at all times by the Federal Pre-Trial Services of the U.S. Probation Offices in San Francisco and in Reno, Nevada, and he compiled an unblemished record of cooperation and compliance.

6. The most significant event for purposes of this memorandum is that Debord Senior accepted employment in sales advocacy[3] with U.S. Ordnance on July 30, 2000. (A copy of the "Employment Agreement" is attached as (EXHIBIT 1). His duties included those associated with sales advocacy (Debord Senior was not authorized to consummate sales) and demonstrations of U.S. Ordnance products to customers and prospective customers. The relationship created by his Nevada contract with the corporation was classic employee-employer arrangement

---

[3] Although his official title was "Sales and Marketing Manager," Debord Senior had absolutely neither authority nor responsibility to do anything even remotely approaching the criteria established in ITAR §§ 120.25 and 126.13 FOR "empowered official" or "senior officer or official." Debord Senior had no authority to set policy or manage anyone or any function of his employer; he had no supervisory responsibilities over any U.S. Ordnance employees; he did not have authority to execute export or import control documents or inquire into any export or import document on behalf of U.S. Ordnance. He was not empowered to verify the legality of any transaction or the accuracy of information submitted; he had no independent authority to refuse to sign any license application or other request for approval; he had no authority to bind his employer for contract purposes; he had no power of attorney or signatory powers with any financial institution; he had no responsibility to execute State or Federal tax documents; and, he was never elected to or appointed to the office of Chief Executive Officer, President, Vice President, to the position of a Senior Official (e.g., Comptroller, Treasurer, General Counsel) or to the Board of Directors of the corporation.

8

and was stringently observed. The Employment Agreement was "at-will."

7. For obvious reasons, the official policy of the Administrative Office of the United States Courts is to encourage full time employment of persons who are on pre-trial release pending trial. Prior to Debord Senior's acceptance of employment with U.S. Ordnance, he petitioned the Court for permission and made full disclosure to the Court of the nature of his employment. The terms of Debord Senior's job description were made known to all concerned Criminal Justice components, including the trial judge. In most criminal cases, a person awaiting trial must surrender his or her passport to the Court. That condition had been applied to Debord Senior and was in effect when he was considering employment with U.S. Ordnance. Debord Senior provided thorough details of the prospective employment to the Office of the United States Attorney, including the fact that the job would entail extensive foreign travel and would require the return of his passport. The U.S. Attorney approved. The Pre Trial Services Agency was informed and recommended approval. Upon oral motion of Debord Senior, the trial judge approved Debord Senior's acceptance of employment and ordered the return of the passport. On November 17, 2000, the trial judge signed an Order reflecting the modifications and changes to Debord Senior's pre-trial release. (EXHIBIT 2). The conduct above demonstrates respect for the Court, a mind set

9

of responsibility and a consciousness of good faith and full disclosure on the part

of Debord Senior. It manifests a belief in the lawfulness of his actions and

evidences an intent to completely obey the letter and the spirit of the law. In short,

before accepting employment, Debord Senior sought prior approval, providing full

disclosure of the nature of his prospective position, an outline of his job description

and informed the Court of the need to travel on behalf of U.S. Ordnance. The

express *imprimaturs* of the United States Attorney, the Federal Pre-Trial Services

and, most significantly, a United States District Judge, would provide assurances

for any reasonable person to conclude that his job as a sales advocate was lawful

and, in fact, was looked upon favorably by those who were controlling his behavior

and who were in a position to know the details of his employment arrangement. In

the course of his employment with U.S. Ordnance, which was terminated on June

1, 2004, Debord Senior was to make more than twenty-five trips out of the country

for sales advocacy on behalf of his employer. Each time he left the area of his

residence in Reno, Nevada, Debord Senior was required to give notice of his plans

and itinerary to Pre-Trial Services. Also, whenever he left the country, the United

States Customs Services monitored his comings and goings. During this entire

period — and indeed during all times relevant to this Petition — there has been

speculation but there has been no finding by any official authorized to make such a

10

finding of a single violation of a statute or even a minor technical infraction of a

rule by U.S. Ordnance or by Debord Junior.

8. On or about the middle of May, 2004, the hitherto healthy collaborative

relationship between regulators and regulated was to experience a reversal. Prior

to then, U.S. Ordnance had enjoyed an ideal relationship of voluntary compliance

and was working collegially and collaboratively with government employees,

whose *raison d'etre* is to foster voluntary compliance with the laws and regulations

controlling the export of products produced by lawful businesses. Everything was

working well. Suddenly and without notice or warning, the collaborative

relationship became hostile.

9. The first sign of trouble ahead for U.S. Ordnance can be pinpointed to a

telephone call from Director Trimble to outside counsel for U.S. Ordnance.

Trimble stated that U.S. Ordnance's Colombian licenses "would be denied" (future

tense) on grounds that he believed that Debord Senior would receive a benefit

(future tense)[4] if they were approved." At that time, U.S. Ordnance had three (3)

DSP-5 applications pending approval to export products to Colombia. It also had

---

[4] The use of the future tense is significant in that it is a clear indication that Director
Trimble had no evidence or information to support a finding that Debord Senior **had** ever
received a benefit from the approval of a U.S. Ordnance license. He was basing his actions on
pure speculation rather than the facts as he knew them.

11

three (3) DSP-5 applications pending approval to export its products to other

nations and one DSP-73 application pending approval to temporarily export

products for demonstrations at the Eurosatory Trade Show in France. Director

Trimble said nothing about revoking or suspending existing licenses. When this

news was learned, U.S. Ordnance had six (6) approved DSP-73 licenses for

demonstrations and trials. Trimble gave no reason for his actions beyond the

statement that he believed Debord Senior **would** receive a benefit if the licenses

were approved. U.S. Ordnance's responded in a letter dated May 25, 2004

**(EXHIBIT 3)**, confirming that Debord Senior was employed as a salesman but, to

allay Director Trimble's speculations, added that he would be terminated effective

June 1, 2004. The letter also contained the following voluntary disclosures:

—  that U.S. Ordnance and its principals were not connected to any
   conduct alleged in the indictment and that, in fact, U.S. Ordnance was
   not even in existence at the times alleged in the indictment, June 1995
   through May 1997;

—  that the allegations underlying the indictment involved conduct by
   Debord Senior as an individual between June 1995 through May 1997,
   prior to the very formation of U.S. Ordnance in July 1997;

—  that the indictment in Debord Senior's case did not involve U.S.
   Ordnance, its officers, directors and shareholders; and

—  that based solely on its interest in defusing even the appearance of
   Director Trimble's speculation that Debord Senior would receive a
   benefit from future licenses, U.S. Ordnance would terminate the

12

employer - employee agreement on June 1, 2004.

10. Of course, Director Trimble's response to U.S. Ordnance's voluntary disclosures was a request for additional information. Upon learning that Debord Senior was an "at-will" U.S. Ordnance employee, in a letter dated June 2, 2004 **(EXHIBIT 4 )**, DTC demanded additional information regarding the role of Debord Senior in the corporation. Although Director Trimble did not state that he was suspending the acceptance of export applications from U.S. Ordnance, the implication was clear. He advised U.S. Ordnance that transaction exceptions for the Colombia licenses could be sought. This disingenuous offer was to prove vacuous. Over the next 16 months, U.S. Ordnance sought transaction exceptions for sixteen (16) licenses, all of which were disapproved or were not processed at all, some for more than six months. One such application exemplifies the prejudice, bad faith and potential adverse effect upon our national security interests attributable to institutional bureaucratic idling. U.S. Ordnance requested an advisory opinion as to whether a license was needed before giving the New Zealand Air Force a $45.00 part to repair one of its M60D machine guns on March 31, 2005. It awaits a response.

11. U.S. Ordnance prepared a thorough response to the June 2 request in a letter with multiple attachments dated June 21, 2004 **(EXHIBIT 5)**. In reviewing

13

documents needed to provide a thorough response, U.S. Ordnance discovered an inadvertent failure to disclose commissions paid to a foreign agent and voluntarily disclosed that fact to DTC in the same June 21 letter.

12.  U.S. Ordnance next received a letter from Director Trimble dated June 24, 2004 (**EXHIBIT 6**), demanding even further information.  In that letter, U.S. Ordnance was informed that DTC "is hereby suspending all licenses and authorizations previously issued to U.S. Ordnance."  That letter still said nothing about what was then a *fait accompli* – the utter refusal to process all new applications for export licenses submitted by U.S. Ordnance.

13.  Even before responding to the latest request for further information, U.S. Ordnance received a telephonic request for information that had already been provided.  A real life bureaucratic game of "Mother May I?"[5] was underway and beginning to gain momentum. In a response forwarded through Counsel, U.S. Ordnance submitted additional information in a July 2, 2004, letter to the Firearms

---

[5] A children's game in which one child announces that he or she will be "Mother" (usually the child with the most highly developed sadistic tendencies).  The game requires the "Mother" to give simple commands, such as "you may take one step forward." The commands are given in any order to any of the players, one at a time.  The only rule is that a player must ask, "Mother, May I?" before obeying the command.  "Mother" has complete discretion to answer "yes, you may." or "no you may not." If a player obeys a command before asking "Mother, May I?" or obeys a command after a "No, you may not." answer from Mother," that child is summarily thrown out of the game.  The putative winner of the game is the last remaining child. Of course, under the rules of this game, the only real winner is "Mother."

14

Licensing Chief responding to the Chief of Firearms Licensing's request for more information (EXHIBIT 7).

14. Finally, U.S. Ordnance received a July 9, 2004, letter from Trimble's office stating that all responses from U.S. Ordnance were incomplete and also requesting extensive additional information, all of which had been previously provided . U.S. Ordnance responded with thorough answers to all requests. It was becoming clear that what U.S. Ordnance perceived as good faith and truthful and complete responses to all requests for information was nothing more than a classic and hopeless bureaucratic "rope-a-dope."

15. On April 4, 2005, U.S. Ordnance, through Counsel, received a faxed "Draft Charging Letter" from Director Trimble's office. The draft accused U.S. Ordnance of thirty-five (35) violations of the AECA and ITAR (EXHIBIT 8). Analysis of the draft charging letter elicits one element common to all counts. At the eye of this tempest is Director Trimble's speculation that Debord Senior, while an employee of U.S. Ordnance between June 30, 2000, through June 1, 2004, was a senior officer or official of U.S. Ordnance. It is apparent that Director Trimble persists in his fallacious belief in spite of overwhelming and incontrovertible evidence to the contrary. However, it is also apparent that he is not inclined to permit the matter to be adjudicated systematically and fairly as prescribed by law.

15

Conspicuously omitted from the draft charging letter was the advice of rights required by ITAR § 128.3, including:

1. Notice to respondent to answer the charges within 30 days as required by Section 128.5;

2. Notice that a failure to answer will be taken as an admission of the truth of the charges;

3. Notice of entitlement to an oral hearing upon written demand for one within 7 days; and,

4. Notice of right to counsel.

16. Over the next several months, U.S. Ordnance, by and through Counsel negotiated (or at least was led to believe it was negotiating) a consent agreement in satisfaction of the charging letter. After many hours of negotiations, the exchange of numerous drafts, numerous telephone calls and meetings, Director Trimble abruptly discontinued all communications and negotiations on the utterly contrived grounds that because Debord Senior was named a party in the charging letter, he (Debord Senior) would have to be a party to the consent agreement being negotiated with U.S. Ordnance. It must be emphasized that this activity took place during a critical stage in the prosecution of Debord Senior. After eight years of foot dragging, the prosecution had done so little to prosecute the criminal case described earlier; in fact, the case had not progressed beyond the discovery phase,

16

and it was now time for the defense to bring the case to closure. Critical

dispositive motions to dismiss the indictment were set for hearings in the period

March through June of 2005. At the conclusion of evidentiary hearings on the

defense motions to dismiss, testimony was adduced from government witnesses

including the prosecutor who sought the original indictment, two current

Supervisory Assistant U.S. Attorneys, senior managers and supervisors and Special

Agents of the U.S. Customs Service and the ATF. Statements of the U.S. Attorney

in office at the time of the original indictment and other former and current

Assistant U.S. Attorneys were introduced as well as Departments of Treasury and

Justice directives. At the close of the evidence the Honorable Fern Smith, United

States District Judge entered a final Order dismissing the indictment with

prejudice. on June , 2005.

    17. The reason given by Director Trimble for aborting negotiations for a

consent agreement between U.S. Ordnance and DTC was the requirement for

Debord Senior to be a party to it. However, the actions of DTC staff are not

consistent with a good faith effort to resume discussions negotiations for the

consent agreement. Counsel for Debord Senior made multiple phone calls[6] to

---

[6] Counsel never reached anyone but multiple voice mail messages were left requesting
return calls from several members of Director Trimble's staff.

17

discuss the Debord Senior's participation, *vel non,* in the consent agreement. Finally, after weeks of messages, a phone call was returned. Counsel explained that he was amenable to reviewing a draft copy of a proposed consent agreement with the inclusion of his client. Counsel concluded the call with the clear expectation that DTC would provide an amended consent agreement for review. Counsel did not receive a draft copy of an amended consent agreement, nor did he hear again from anyone in DTC. The reason for DTC's failure to follow through became known about a week later when Counsel for U.S. Ordnance received an e-mail message from a member of Director Trimble's staff.

18. The e-mail, dated May 26, 2005 **(EXHIBIT 9)**, disclosed that "... David (Director Trimble) has directed Peter and I to temporarily suspend any work on the proposed consent agreement/charging letter. The Department of Justice has asked him to do so as they are looking at related files. ..."

19. Following a change in Counsel [7], U.S. Ordnance made a final attempt to resolve whatever controversy remained with Director Trimble or, at the very least, to ascertain what steps could be taken to restore U.S. Ordnance to equal status with

---

[7] An event that was highly relevant to resolving the U.S. Ordnance case had occurred between the last discussion about the consent agreement and this phone call. The case against Debord Senior was dismissed with prejudice in June 2005. Debord Senior was no longer under indictment and he had not been convicted of any offense against the United States.

all other registrants and exporters of defense articles.  In a July 9, 2005, telephone conversation, Counsel requested a meeting to mend the fractured relationship. **(EXHIBIT 10)** is a letter to Director Trimble memorializing that conversation.

### ISSUE

20.  The above facts above give rise to the single issue:

Given that U.S. Ordnance was penalized and punished after being denied all **prior** due process safeguards guaranteed in ITAR § 127; that is, notice, an opportunity for a hearing and the right to a decision based on the findings of an Assistant Secretary of State (Political-Military Affairs):

**Whether a *de facto* administrative debarment imposed by an unauthorized person without prior compliance with the procedural safeguards of ITAR § 127 is void *ab initio*? And, if so, what remedies are available?**

# DISCUSSION

## A.   DEBARMENT

21.  Debarment [8] means to prohibit a person from participating directly or

indirectly in the export of defense articles.  There are two distinct and separate

classes of debarment, statutory and administrative.  "Statutory debarment" [9] is not

relevant to this petition because, as the name implies, the use of "statutory

debarment" is limited to cases involving **conviction** for an AECA offense or

conspiracy to violate the AECA, 22 U.S.C. §§ 2278, 2279 (*See* ITAR 127.7(c)).   In

the instant case, there has been no conviction of anyone of any offense against the

United States.

## B.   ADMINISTRATIVE DEBARMENT

22.  Nevertheless, U.S. Ordnance has been under *de facto* debarment since

June 2004 and has yet to be served with any required notice.  There may be a

distinction but there is no real difference between the punishments for either

---

[8] ITAR §127.7(a) provides, "... the Assistant Secretary of State for Politico-Military
Affairs may prohibit any person from participating directly or indirectly in the export of defense
articles, ...  Any such prohibition is referred to as a debarment for purposes of this subchapter.
The Assistant Secretary of State for Politico-Military Affairs shall determine the appropriate
period of time for debarment, which shall generally be for a period of three years."

[9]  ITAR § 127.7(c) provides, . "debarment in such cases is based solely upon the outcome
of a criminal proceeding, conducted by a court of the United States, that established guilt beyond
a reasonable doubt in accordance with due process."

statutory or administrative debarment. Irrespective of the label, it is beyond

dispute that the small business has been accused, tried and punished for

debarment. By whatever name, a punishment of *defacto* debarment was imposed

by Director Trimble, a person who is **not** empowered to impose such a

punishment. Nevertheless, his position enables him to carry it out unlawfully.

## C.   DEBARMENT MAY NOT BE IMPOSED PRIOR TO COMPLIANCE WITH THE DUE PROCESSES GUARANTEED IN ITAR §§ 128.3(a) AND 128(b).

23. Prior to debarment, U.S. Ordnance was denied the right to be served

with a Charging Letter which must contain these elements *(See ITAR § 128.3(a)*

and (b)):

— A statement of the essential facts constituting the alleged violations with cites to the regulations or other provisions involved;

— Notice that an answer must be filed within thirty (30) days of service;

— Notice of the right to a hearing upon written demand; and,

— Notice of the right to Counsel.

24. Prior to debarment, U.S. Ordnance, was denied the right to the

appointment of an Administrative Law Judge as required by ITAR § 128.5(c).

25. Prior to debarment, U.S. Ordnance, was denied the right to discovery of

relevant information, books, records, and other evidence from any person or

21

governmental agency as required by ITAR § 128.6(a).

26. Prior to debarment, U.S. Ordnance, was denied the right to request issuance of enforceable subpoenas for witnesses and for the production of evidence relevant to the proceedings, as required by ITAR § 128.6(c).

27. Prior to debarment, U.S. Ordnance was denied the right to request a hearing including the right to have oaths administered and the right to confront witnesses and to challenge documentary evidence, as required by ITAR § 128.8.

28. Prior to debarment, U.S. Ordnance was denied the right to resolution of issues by the Assistant Secretary for Political-Military Affairs, based on the Administrative Law Judge's advisory findings of fact and law as to whether a regulation has been violated, as required ITAR §§ 128.8(a), 128.8(b).

29. In the case of an adverse ruling by the Assistant Secretary for Political-Military Affairs, U.S. Ordnance was denied all rights to request reconsideration and a rehearing by the Administrative Law Judge, as is guaranteed by 128.12. as well as the right to appeal an adverse decision to the Under Secretary for Arms Control and International Security and the right to request a hearing as guaranteed by ITAR §§ 128.13(a) and 128.14(e)(2) respectively.

22

## CONCLUSION

In a nation founded on the rule of law, government employees are not above

the law.   In view of the facts, law, points and authorities set forth above and for

other reasons which may be known to the Assistant Secretary for Political-Military

Affairs, the only reasonable inference is that unlawful acts and omissions by

Director Trimble resulted in the imposition of an unlawful *de facto* debarment of a

small American owned business.  U.S. Ordnance, the victim, respectfully requests

the issuance of an Order setting aside all directives, instructions, orders, etc., issued

by Director Trimble to implement the *de facto* debarment.

1.   The remedy for the unauthorized cancellation of U.S. Ordnance export
     licenses is to restore them;

2.   The remedy for the unlawful refusal to approve or deny new export
     license applications is the issuance of an Order of Mandamus to
     Director Trimble directing him to process the applications now
     pending and also directing him to accept the licenses which have been
     returned without action over the past fourteen (14) months;

23

3.       The remedy for pernicious and prejudicial acts and omissions by
Director Trimble is an Order recusing him from further participation in any
matter regarding U.S. Ordnance which relates to approvals to import or
export  defense articles or services.

                          Respectfully submitted,


                          Robert E. Sanders
                          Counsel for U.S. Ordnance

24

MAR-22-2006  00:29        PM/DDTC                              202 663 2921    P.02

EXHIBIT 1

# EMPLOYMENT AGREEMENT

AGREEMENT, dated July 30, 2000, between U. S. ORDNANCE, a Nevada corporation, located in Sparks, Nevada (hereinafter "the Corporation") and Curtis Lynn Debord, (hereinafter "the MANAGER").

Now, therefore, the parties hereto agree as follows:

1.   EMPLOYMENT.  The Corporation shall employ the MANAGER, and the MANAGER shall serve the Corporation upon the terms and conditions hereinafter set forth.

2. TERM AND EXTENSION.  The employment of the MANAGER as a Sales and Marketing Manager hereunder shall commence on July 30, 2000 and shall continue unless and until terminated in writing by either party, upon thirty (30) days notice.

3.   DUTIES.  During the period of his employment hereunder, the MANAGER shall serve the Corporation and shall perform customer representative and sales services required or requested in connection with the business of Corporation.  Within the limitations hereinabove provided, the MANAGER will render such other advisory services in connection with the services of the Corporation as may be requested from time to time by the officers or directors of the Corporation, without further compensation other than that for which provision is made in this Agreement.

4.   TIME REQUIREMENTS.  The MANAGER shall devote during the period of this agreement such time, energy, and skill to the duties of his employment hereunder sufficient to adequately represent the company and shall periodically, or at any time upon the request of the Corporation, submit data as to the time performed.

5. COMPENSATION. The Corporation shall pay to the MANAGER for his services sums in the aggregate amounting to $1,000 per week, plus five percent (5%) of the gross sales of the Corporation, provided that the MANAGER shall, by his efforts, increase the gross sales of the corporation to an amount in excess of $1 million annually, during the period of his employment hereunder.  MANAGER shall also be reimbursed for all travel, meals and lodging expenses incurred in the service of the Corporation.  In recognition that the company is in a "cash-poor" situation at the inception of this agreement, MANAGER agrees to defer all sums due hereunder with the exception of expense reimbursements at such time as the cash situation of the company improves to a point where the company representative and MANAGER agree

that payment can be made to MANAGER without impairing the financial condition of Corporation. At such time as payments can be regularly made, payments will be made upon payment being made to Corporation from customers ordering through or on behalf of MANAGER.

6.   INDEMNIFICATION  AND  HOLD  HARMLESS  PROVISION.   The MANAGER agrees hereby to indemnify and hold harmless the Corporation from any and all claims by the MANAGER which may arise out of and in the course of the performance of his duties hereunder.  Any and all claims for unemployment benefits and or claims for workers' compensation benefits are hereby expressly waived by the within MANAGER who agrees to maintain separate policies of liability, health, and accident insurance as may be necessary or required by the Corporation in connection with the performance of its duties herein.

7.   RELATIONSHIP BETWEEN PARTIES.  The MANAGER is engaged by the Corporation only for the purposes and to the extent set forth in this Agreement. His relation to the Corporation shall, during the period or periods of his engagement and services hereunder, be that of an employee.

8.   PROFESSIONAL RESPONSIBILITY.   Nothing in this Agreement shall be construed to interfere with or otherwise affect the rendering of services by the MANAGER in accordance with his independent and professional judgment.  The MANAGER shall perform his services in a good and workmanlike manner and in accordance with generally accepted business practices.

9.   ENTIRE AGREEMENT.  The within Agreement shall be construed in accordance with Nevada law and shall constitute the entire Agreement between the parties.  In witness whereof, U. S. Ordnance has caused this Agreement to be executed in its corporate name by its corporate officers, and Curtis Lynn Debord, the MANAGER hereunder, has set his hand and seal, as of this day and year first above written.

Curtis Lynn Debord,
MANAGER

President, U. S. Ordnance

EXHIBIT 2

NOV-21-2000  14:32  FROM  PSA ND CA                    TO        PSA RENO NV  P.82

1  DAVID W. DRATMAN
   Attorney at Law
2  State Bar No. 78764
   428 J Street, Suite 202
3  Sacramento, CA 95814
   Telephone:  (916) 443-2000

4
5  LAW OFFICES OF CHRIS MANCINI
   Florida State Bar. No. 539351
6  407 Lincoln Road, Suite 12E
   Miami Beach, FL 33139
7  Telephone: (305) 856-0661

8  Attorneys for Defendant
   CURTIS LYNN DEBORD

**RECEIVED**

NOV 1 6 2000

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**FILED**

NOV 1 7 2000

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

10                IN THE UNITED STATES DISTRICT COURT

11             FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13  UNITED STATES OF AMERICA,            )    CR. 97-239 MMC
                                         )
14              Plaintiff,               )
                                         )
15      v.                               )    STIPULATION MODIFYING
                                         )    RELEASE CONDITIONS
16  CURTIS LYNN DEBORD, et al.,          )    AND ORDER
                                         )
17                                       )
                                         )
18              Defendants.              )

19      IT IS HEREBY STIPULATED between the UNITED STATES OF AMERICA, through its

20  attorney of record, WILLIAM P. SCHAEFER, Assistant U.S. Attorney and Defendant CURTIS

21  LYNN DEBORD, through his attorney of record, DAVID W. DRATMAN, with the approval of

22  Pretrial Services that the defendant's conditions of release may be modified as follows:

23      1.    Defendant shall be permitted to travel with the advance approval of Pretrial Services

24  without notification or approval of the United States Attorney.

25  //

26  //

27  //

28

                                    1

NOV-21-2000  14:32   FROM  PSA ND CA              TO        PSA RENO NV   P.03

2. It is further stipulated that defendant, CURTIS LYNN DEBORD, shall not have any contact with any individual that may be a witness in this case, except in the presence of one of his attorneys.

3. It is further stipulated that Mr. Debord shall continue to abide by all other conditions of his release.

Dated:  11-1-00                          _____
                                          DAVID W. DRATMAN
                                          CHRIS MANCINI
                                          Attorneys for Defendant
                                          CURTIS LYNN DEBORD

Dated:  11-13-00                          ROBERT S. MUELLER, III
                                          United States Attorney


                                   By: _____
                                          WILLIAM P. SCHAEFER
                                          Assistant U.S. Attorney
                                          for the Government

## ORDER

Based on the stipulation of the parties, it is hereby ordered that the defendant's conditions of release are modified as follows:

1. Defendant shall be permitted to travel with the advance approval of Pretrial Services without notification or approval of the United States Attorney.

2. Defendant shall not have any contact with any individual that may be a witness in this case, except in the presence of one of his attorneys.

3. Defendant shall continue to abide by all other conditions of his release.

Dated:  NOV 1 7 2000                      _____
                                          MAXINE M. CHESNEY
                                          United States District Court Judge

2

p.2                                                      Aug 15 05 04:16p

## CERTIFICATE OF SERVICE

I am a citizen of the United States and a resident of the County of Sacramento. I am over the age of eighteen years and not a party to the above-entitled action; my business address is 428 J Street, Suite 202, Sacramento, California 95814.

On the date below, I served the following document(s):

## STIPULATION MODIFYING RELEASE CONDITIONS AND ORDER

(X)    BY MAIL and FEDERAL EXPRESS. I caused such envelope, with postage thereon fully prepaid, to be placed in the United States Mail at Sacramento, California addressed as follows:

WILLIAM P. SCHAEFER
Assistant U.S. Attorney
Organized Crime Strike Force
Federal Building
450 Golden Gate Avenue, 11th Floor
San Francisco, CA 94102


()    BY PERSONAL SERVICE. I caused such document(s) to be delivered by hand to the offices of the person(s) listed below:



()    BY FACSIMILE SERVICE. I caused the document(s) to be served via facsimile to the person(s) listed below:




I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 1, 2000 at _Sacramento_, California.


                                            _[signature]_
                                            Declarant

EXHIBIT 3



# U. S.
# ORDNANCE,
# INC.

2500 Valley Road Unit Z
Reno, Nevada 89512                                          Ph:775-356-1303
                                                            FAX:775-356-2388
Email: info@usord.com  Web: www.usord.com

May 25, 2004


Mr. David Trimble
Director, Office of Defense Trade Controls Compliance
PM/DTC, SA-1, 12th Floor
U.S. Department of State
2401 E Street, NW
Washington, DC 20522-0112


            RE: U.S. Ordnance, Inc.


Dear Mr. Trimble:

        This letter is a follow-up to discussions between you and Mark Barnes, counsel to U.S. Ordnance, Inc. (the "Company"). Most important, I would like to emphasize, the Company is not implicated in, and had no involvement with, the violations alleged in Case No. 97-00239-MMC, pending in the United States District Court for the Northern District of California. Additionally, only two counts in Case No. 97-00239-MMC fall under the International Traffic in Arms Regulations, 22 C.F.R. § 120.27, and the related Office of Defense Trade Controls Compliance ("DTC") policies.

        Count One, pertaining to Conspiracy, is charged under 18 U.S.C. § 371; and Count Eleven, pertaining to Arms Embargo, is charged under the Arms Export Control Act, 22 U.S.C. § 2778. None of the remaining counts, and none of those already dismissed, are relevant under 22 C.F.R. § 120.27. We have included all dismissed and pending counts as alleged in the charging instruments, which will be delivered to you under separate cover. Based on the following information, however, there is no factual nexus between the Company's activities and any charges, whether still pending or dismissed, in Case No. 97-00239-MMC.

        The charges alleged in the original indictment in Case No. 97-00239-MMC pertain solely to alleged wrongdoing by Mr. Debord, Sr. in his individual capacity. All violations alleged in the indictment allegedly occurred during the period June 1995 through May 1997. The Company did not commence its corporate existence until July 28, 1997, more than two months after any alleged violations transpired. None of the Company principals are connected in any way to the alleged violations. Since its inception, Mr. Debord, Jr. has owned 100% of the Company's stock, held all officer positions, and been the sole director. No officers or directors of the Company are implicated in any manner, or are witnesses, in Case No. 97-00239-MMC. Consequently, the certification letter accompanying the Company's export Registration Statement, submitted to the U.S. Department of State on January 7, 2004, remains true in its entirety. The Company also employs approximately 18 other individuals on a full-time basis. No Company employees have been implicated, either as indictees, witnesses or in any other manner, in Case No. 97-00239-MMC.

All of the charges in Case No. 97-00239-MMC pertain to conduct allegedly undertaken by Mr. Debord, Sr. in his individual capacity, prior to May 1997. Mr. Debord, Sr.'s association with the Company did not begin until March 2000, when the Company employed him on a part-time basis. This was almost three years after any alleged wrongdoing occurred. While the pending case has not affected Mr. Debord, Sr.'s ability to perform services for the Company, the Company and Mr. Debord, Sr. have decided to separate him from service with the Company, effective June 1, 2004. The Company and Mr. Debord, Sr. believe this is the best course of action until matters are settled in connection with Case No. 97-00239-MMC.

The Company hopes that the foregoing information fully addresses any concerns DTC has in connection with Mr. Debord, Sr.'s relationship with the Company, and its effect on Company export matters. The Company remains a reliable defense trade partner, and wishes to immediately continue with its planned export to Colombia as soon as possible. U.S. Ordnance, Inc. is facing penalties from the Colombian government, as these deliveries are urgently needed by the Colombian government for fighting insurgent forces and drug traffickers. Additionally, the delay in delivery has disrupted Company operations, which is causing the Company increasing financial difficulties. An expedited resolution of this matter is imperative to the Company fulfilling its obligations to the Colombian government, remaining a financially viable corporation, and performing other services for the United States Government which are vital to defense needs.

If you have any further questions, please call Curtis Debord Jr. at 775-356-2380.

Curtis Debord, Jr.
President, U.S. Ordnance, Inc.

EXHIBIT 4

MAR-22-2006  00:31    PM/DDTC                                    202 663 2921    P.13



**United States Department of State**

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

*Washington, D.C. 20520-0112*

In Reply Refer To:
DTC Case No. RR 04-118                                   JUN - 2 2004

Mr. Curtis Debord, Jr.
President
U.S. Ordnance, Inc.
2500 Valley Road Unit Z
Reno, Nevada 89512
DTC Code: 14291

Reference:    Your letter dated May 25, 2004

Dear Mr. Debord:

        This Office received your letter cited above. Please submit a full disclosure (using the elements specified in International Traffic in Arms Regulations Section 127.12) regarding the relationship of Curtis Debord Sr. to U.S. Ordnance, including but not limited to his role in establishing and maintaining the company, and any responsibilities associated therewith; and his financial investment in and any compensation or benefits received from the company; and his specific involvement in export and brokering activity related to approved and pending licenses. This response should be provided no later than June 20, 2004.

        While evaluating the above information, this Office is prepared to consider, on a case-by-case basis, processing license applications (to include the referenced Columbia license application) as transaction exceptions. To make a transaction exception request, you must submit relevant information so we may consider:

- Whether an exception is warranted by overriding United States foreign policy or national security interests;
- Whether an exception would further law enforcement concerns that are consistent with the foreign policy or national security interests of the United States; or
- Whether other compelling concerns exist that are consistent with the foreign policy or national security interests of the United States and law enforcement concerns.

We will act on your request as soon as the above documentation is received.  Please direct all correspondence as well as any questions or comments on this matter to me at (202) 663-2809 or Mr. Peter Sullivan at (202) 663-2831.

Sincerely,

Deborah Carroll
Chief
Enforcement Division

EXHIBIT 5

# U. S. ORDNANCE, INC.

2500 Valley Road, Ste Z
Reno, NV 89512

Phone: 775-356-2380
Fax: 775-356-2388

Email: info@usord.com   Web: www.usord.com

June 21, 2004

# BY HAND DELIVERY

Ms. Deborah Carroll
Chief
Enforcement Division
U.S. Department of State
Bureau of Political-Military Affairs
Directorate of Defense Trade Controls
Washington, D.C. 20520-0112

**RE: DTC Case No. RR 04-118**

Dear Ms. Carroll:

This is in response to your letter dated June 2, 2004, regarding U.S. Ordnance and its former employee, Curtis Lynn Debord.[1] Pursuant to your request, following is a full report explaining the role Mr. Debord, Sr. played in U.S. Ordnance, prior to his separation on June 1, 2004. U.S. Ordnance is providing this report pursuant to instructions from the Directorate of Defense Trade Controls ("Directorate"), and not because U.S. Ordnance believes it should make a voluntary disclosure under § 127.12 of the International Traffic in Arms Regulations ("ITAR"). U.S. Ordnance refutes and protests any implication that this report is provided in connection with a possible violation committed by U.S. Ordnance.

Under the Freedom of Information Act, all providers of information to which source information is attributable in this submission hereby assert their right to have such information exempted from disclosure to third parties pursuant to applicable provisions of the Act. 5 U.S.C. § 522 (b)(3); (b)(4); (b)(6). Additionally, they further assert their rights under applicable provisions of the Privacy Act, 5 U.S.C. § 552(a), and applicable provisions of the Internal Revenue Code to protect personal and taxpayer information from disclosure to third parties.

Curtis Debord, Sr.'s individual ineligibility, in connection with Case No. 97-00239-MMC pending in the United States District Court for the Northern District of California and 22 C.F.R. § 120.1(c), should not taint the lawful export activities of U.S. Ordnance. Mr. Debord, Sr. played no role in establishing U.S. Ordnance, he never financially invested in the company, nor did he ever participate in any export or brokering activities. The following information demonstrates that Mr. Debord, Sr. was simply an employee of U.S. Ordnance, and he did not receive any direct or indirect benefits from his employment beyond just compensation.

## A. FORMATION OF U.S. ORDNANCE

In 1993 Curtis Debord, Jr. started American Arms/Delta in Reno, Nevada. The business was first involved in manufacturing machine guns for the motion picture industry, but evolved into the manufacture of commercial firearms for the collectors' market. U.S. Ordnance was incorporated in the State of Nevada by Curtis Debord, Jr. on July 28, 1997 (see Attachment A) for the purpose of taking over the

---

[1] Curtis Lynn Debord is the father of Curtis Lee Debord, President of U.S. Ordnance. For purposes of clarification, Curtis Lynn Debord will hereinafter be referred to as Curtis Debord, Sr. or Mr. Debord, Sr. Curtis Lee Debord will hereinafter be referred to as Curtis Debord, Jr. or Mr. Debord, Jr.

manufacturing of commercial collector-grade firearms from American Arms/Delta. At the time of incorporation, Mr. Debord, Jr.'s attorney, Steven F. Stucker, briefly held the position of initial director of the company, as well as all officer positions (see Attachment B). On September 10, 1997, less than two months after incorporation, Mr. Debord, Jr. became the sole director of the company, and was elected to all officer positions (see Attachment C). As evidenced by the reports filed annually with the State of Nevada, Mr. Debord, Jr. has retained the position of director, and all officer positions in the company since September 10, 1997 (see Attachment D). At no time has Mr. Debord, Sr. ever served as director of U.S. Ordnance, or held any officer positions of the company, and therefore has never played any part in the company's business management decisions. In fact, Mr. Debord, Sr.'s employment as a Sales and Marketing Manager did not commence until 2000. Prior to this, Mr. Debord, Sr. was not involved with any of the daily operations of U.S. Ordnance, nor did he contribute to its business strategy. Mr. Debord, Sr. clearly had no role in establishing U.S. Ordnance.

## B. U.S. ORDNANCE GROWTH AND EMPLOYMENT OF MR. DEBORD, SR.

In 2000, U.S. Ordnance experienced significant growth in demand for its products. In connection with a SACO Defense licensing agreement, U.S. Ordnance became the exclusive manufacturer and sole distributor for all models of the M60 Series machine gun and spare parts. This agreement established U.S. Ordnance as the sole source for M60 machine guns for the U.S. Government, in support of FMS sales, and foreign entities. Because the M60 machine gun is largely utilized in foreign markets, these markets were primarily targeted as part of U.S. Ordnance's business model. However, even with a significant amount of foreign sales, the United States military remains U.S. Ordnance's second largest customer. Due to the ensuing demand for U.S. Ordnance products, U.S. Ordnance needed to hire new employees to support its efforts. U.S. Ordnance sought Mr. Debord, Sr.'s assistance on a part-time basis to assist the company's sales and marketing efforts. Mr. Debord, Sr. did not pursue this employment. Rather, U.S. Ordnance sought to hire employees, like Mr. Debord, Sr., who were highly qualified to further its sales and marketing efforts. Additionally, U.S. Ordnance targeted foreign markets not because of any suggestion by Mr. Debord, Sr., but because it was wholly in accordance with its business strategy, and the nature of the M60's role as a first line machine gun for non-NATO forces. Finally, pursuant to 22 U.S.C. § 2778(b), as a manufacturer of defense articles U.S. Ordnance was required to register with the Department of State as an exporter, regardless of whether U.S. Ordnance ever intended to export products or not.

Between 2000 and 2003, as a result of an aggressive marketing campaign and its qualified salespeople, U.S. Ordnance experienced tremendous growth in the number of trade shows and demonstrations it attended. This increase in business required Mr. Debord, Sr.'s full-time employment with U.S. Ordnance beginning in January 2003. Again, it was U.S. Ordnance who sought Mr. Debord, Sr.'s increased time commitment, it was not a change requested by Mr. Debord, Sr.

## C. MR. DEBORD, SR.'S EMPLOYMENT DESCRIPTION AND DUTIES

U.S. Ordnance employed Mr. Debord, Sr. to utilize his knowledge of firearms, and his efficacy as a salesman. As a Sales and Marketing Manager, Mr. Debord, Sr.'s main responsibilities included traveling to tradeshows world-wide to present U.S. Ordnance products, identifying business opportunities in commercial, governmental, and defense markets, and presenting product information while another member of the U.S. Ordnance sales and marketing team conducted demonstrations for U.S. and foreign military entities (see Attachment E). The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the Department of Justice ("DOJ") were fully aware that Mr. Debord, Sr. was present while firearms were being demonstrated to potential or existing clients. Neither ATF nor DOJ had any problem with this arrangement as long as firearms were not transferred to Mr. Debord, Sr. Because his job responsibilities required him to travel a substantial amount of the time, on average Mr. Debord, Sr. was only present at the U.S. Ordnance worksite 15-20 hours a week. U.S. Ordnance never tried to conceal Mr. Debord, Sr.'s employment or his related duties, because there was nothing unlawful involved. In fact, Mr. Debord, Sr. was allowed to receive a passport in order to carry out his responsibilities as a Sales and Marketing Manager.

While not traveling, Mr. Debord, Sr. had a very limited role (primarily technical manufacturing advice) at U.S. Ordnance, beyond attending sales and safety meetings. Additionally, since 1978, Mr. Debord, Sr. has owned and operated his own company, which is and has been wholly separate from U.S.

Ordnance. Mr. Debord, Sr. has continued to operate and derive income from this business. With this source of income, Mr. Debord, Sr. did not need employment with U.S. Ordnance, but agreed to assist his son with his expanding business. Until 2003, U.S. Ordnance received the benefit of Mr. Debord, Sr.'s services and expertise without providing him with any financial compensation in return.

## D. COMPENSATION

The terms of Mr. Debord, Sr.'s Employment Agreement, dated July 30, 2000, provided for a salary of $1,000 per week, plus five percent of the gross sales of U.S. Ordnance, provided that Mr. Debord, Sr. increased the gross sales to an amount in excess of $1 million annually (see Attachment F). As evidenced by the attached documentation, this compensation was well below market average (see Attachment G). The terms also acknowledged that because U.S. Ordnance was in a "cash-poor" situation at the time, Mr. Debord, Sr. would defer both his salary and the sales incentive bonus. This financial arrangement with U.S. Ordnance was not unique to Mr. Debord, Sr. Curtis Debord, Jr., President and CEO, and Norman Justice, a manufacturing engineer who had previously been the Chief Manufacturing Engineer on the M60 machine gun for SACO Defense, also agreed to defer receiving compensation until U.S. Ordnance became more profitable. From 1998 through 2001, U.S. Ordnance experienced net losses, and generated only a negligible net income in 2002 (see Attachment H). As a result, Mr. Debord, Sr. did not receive compensation, and Mr. Debord, Jr. and Mr. Justice received salaries far below the average market salary (see Attachment I).

Due to U.S. Ordnance's increased production and profitability in 2003, Mr. Debord, Sr. received his stated salary of $1,000 per week from January 2003 through his separation on June 1, 2004. Additionally, pursuant to the advice of Sidley & Associates, an independent accounting firm, at the end of December 2003 U.S. Ordnance paid Mr. Debord, Sr. the compensation that was due him in connection with the terms of his Employment Agreement. Mr. Debord, Sr. earned a salary of $22,000 in 2000, and $52,000 yearly from 2001 through 2003, for a total outstanding balance of $178,000. He was also entitled to five percent of the gross sales in excess of $1 million annually. This amounted to $135,849 in 2001, $239,128 in 2002, and $527,217 in 2003. The attached Analysis of Salary and Bonus to Curtis Debord, Sr. provides further detail and evidences that the money owed to Mr. Debord, Sr. through 2003 totaled $1,080,194 (see Attachment J). At the end of December 2003, U.S. Ordnance paid Mr. Debord, Sr. $1,048,000, and still owes him the balance of $32,194. This payment was money due and owing Mr. Debord, Sr. and, pursuant to the advice of Sidley & Associates, was paid as soon as U.S. Ordnance could feasibly do so. This payment was solely based on the compensation due Mr. Debord, Sr. for the lawful work he performed for U.S. Ordnance as a Sales and Marketing Manager. U.S. Ordnance was advised by Sidley & Associates to pay all of its employees who were owed compensation. This payment was therefore not a payment unique to Mr. Debord, Sr. Comparable payments were also made to Mr. Debord, Jr. and Mr. Justice to pay the money that was also due them as a result of deferring or receiving below market average salaries. Upon request, further information can be provided by Sidley & Associates.

While U.S. Ordnance did increase its profitability during 2003, it also expected to generate further income in connection with its planned exports to the Colombian Army under Plan Colombia, a U.S. initiative. U.S. Ordnance exhausted much of its resources in building the weapons it had contracted to ship to Colombia, but was not able to fulfill its obligations and receive payment because the necessary licenses have not been received from the Office of Defense Trade Controls ("DTC"). One of the three licenses at issue was applied for as early as October 21, 2003. Due to additional requests for information from the State Department, Congressional notification, and the current review by DTC, U.S. Ordnance has been waiting for at least one Colombian license for almost eight months. As a result, U.S. Ordnance was forced to borrow $500,000 from Curtis Debord, Sr., $500,000 from Curtis Debord, Jr. and $500,000 from U.S. Bank to continue its daily operations. Without these loans, U.S. Ordnance would have had to suspend its operations, to the detriment of the company and all of its employees, and to the efficacy of Plan Colombia insofar as the weapons it had planned to export to the Colombian military were part of Plan Colombia.

The terms of Mr. Debord, Jr.'s and Mr. Debord, Sr.'s promissory notes require U.S. Ordnance to repay the principal, and six percent interest, to the lenders on or before December 30, 2004, with no monthly payments required (see Attachment K). No remuneration, with the exception of the payment of principal and interest, is involved in the repayment of the loan to Mr. Debord, Sr. The transaction was

required solely because U.S. Ordnance has not received the permits from DTC necessary to export weapons to the Colombian Army. The loan was, however, lawful and Mr. Debord, Sr. is currently a creditor of U.S. Ordnance similar to any other lending entity. If required by DTC, U.S. Ordnance will divest itself of the debt to Mr. Debord, Sr. in order to proceed with its Colombian transactions, and all other exporting activities.

U.S. Ordnance protests any implication that the loan from Mr. Debord, Sr. is an improper investment in U.S. Ordnance, but will comply with DTC's requirements in order to continue its status as a reliable defense trade partner. U.S. Ordnance greatly desires to repay the loans from both Mr. Debord, Sr. and Mr. Debord, Jr. but has been prevented from doing so because of its current financial situation. The aggregate $1.5 million U.S. Ordnance borrowed from Mr. Debord, Jr., Mr. Debord, Sr. and U.S. Bank has been almost entirely exhausted and the company cannot continue its daily operations for much longer without the ability to fulfill its obligations under its contracts. Approval of pending licenses will allow U.S. Ordnance to simultaneously further the goals of the United States under Plan Colombia and generate enough income to repay its debts and remain financially viable.

Finally, Mr. Debord, Sr. has never owned an equity interest in U.S. Ordnance. Of the 25,000,000 authorized shares of U.S. Ordnance Common Stock, 1,000,000 shares were issued to Curtis Debord, Jr. on September 10, 1997 (see Attachment L). The attached copy of Stock Certificate Number 1 represents all of U.S. Ordnance's issued and outstanding shares (see Attachment M). Consequently, Mr. Debord, Jr. is the only person who has an equity investment in U.S. Ordnance, and who has received stock dividends from share ownership. Mr. Debord, Sr. never financially invested in U.S. Ordnance.

## E. EXPORT AND BROKERING ACTIVITIES

The compensation Mr. Debord, Sr. did receive was for his service solely to the Sales and Marketing Department. All other U.S. Ordnance business affairs, including export activities, were handled by other U.S. Ordnance employees (see Attachment N). Typically, Mr. Debord, Sr. met with clients to present and discuss products that are available from U.S. Ordnance. Mr. Norman Justice was responsible for providing cost estimates and quotes to clients, and for identifying key business sectors prior to January 1, 2004, and this role was assumed by Mr. Steve Helzer after that date. The resulting price is then confirmed with Curtis Debord, Jr., Mr. Dan Fassler, Production Manager, and Steve Helzer, Marketing Manager. The offer that is ultimately submitted to the potential client is prepared by Mr. Helzer and approved and signed by Mr. Debord, Jr. Currently, forms associated with this process, such as the formal offer and export license applications, are prepared by Messrs. Helzer, Justice, and Debord, Jr. Prior to November 2003, FD and Associates, a law firm located in McLean, Virginia, handled license forms and their submission on behalf of U.S. Ordnance. Mr. Debord, Sr.'s responsibilities were limited to representing the company and presenting its products to potential or existing clients, but his function ended after such a presentation. He, therefore, never participated in the company's export activities.

Similarly, Mr. Debord, Sr. never had any role in any brokering activities performed by U.S. Ordnance. U.S. Ordnance is registered with DTC as a manufacturer of Defense Articles, and all of its export licenses are under PMDTC Registration Code: M1429. Mr. Debord, Sr. never functioned in a brokering capacity, as defined in § 129.2 of the ITAR. While Mr. Debord, Sr. did meet with clients to present products, he did so in his capacity as an employee of U.S. Ordnance, not as an agent. Furthermore, Mr. Debord, Sr. never acted as an agent for any third party conducting business with U.S. Ordnance, nor did he ever receive any form of compensation from any third party for such conduct.

The compensation Mr. Debord, Sr. did receive was a result of the total U.S. Ordnance sales, regardless of whether they were foreign or domestic. If a substantial amount of sales were indeed foreign, it was pursuant to the goals of U.S. Ordnance, not any of its individual employees. At the end of the fiscal year, all sales were calculated, and an incentive bonus was paid (or deferred) to Mr. Debord, Sr. equal to five percent of the total sales over $1 million. This compensation was due Mr. Debord, Sr. in accordance with his Employment Agreement, and was not dependent on any foreign export activities performed by U.S. Ordnance. Also, the bonus compensation structure was comparable to that paid to other employees, who had similar responsibilities. For example, Mr. Norman Justice receives the sum of three percent on all sales of M60 machine guns and spare parts. This compensation is paid regardless of whether the sales are to foreign or domestic entities. The amount of Mr. Debord, Sr.'s compensation was determined by his success as a salesman, but was not dependent solely on the exports of U.S. Ordnance.

Additionally, because Mr. Debord, Sr. is separated from U.S. Ordnance, he will not receive any further compensation based on the sales related to U.S. Ordnance's pending licenses. He will receive no direct or indirect benefit from the approval of the Colombian licenses or any other pending licenses.

While performing a thorough review of the above export activities, U.S. Ordnance's counsel drew to our attention that the commission paid to the company's routine registered agent in Colombia had not been reported pursuant to the requirements of 22 C.F.R. § 130.9. This omission was inadvertent. U.S. Ordnance acquired the registered agent as a result of the April 2000 licensing agreement with SACO Defense. U.S. Ordnance subsequently followed the licensing routine established by SACO Defense, and believed that the intent of § 130.9 was to prevent foreign corruption and did not apply to routinely utilized overseas registered agents. Following an established routine is no excuse for not properly disclosing required information, and U.S. Ordnance is researching the matter thoroughly. In each transaction a negotiated fee or commission was paid to the same individual, who also represents other established U.S. and foreign companies in Colombia. U.S. Ordnance and Curtis Debord, Sr. have no financial investment in or any relationship to the agent or his firm whatsoever. It is simply a professional services relationship. This agent had been performing the same work for SACO Defense previously, as well as other U.S. companies. We are presently reviewing all documents related to these transactions and will provide the Office of Defense Trade Controls Compliance a full and accurate report of the precise amount of these commissions in accordance with the guidelines set out in 22 C.F.R. § 130.10.

U.S. Ordnance regrets its oversight in failing to include this information when it submitted previous license applications, and we are providing further training and instruction to our staff so there is a clearer understanding of our general reporting obligations, and those required when omissions are involved that are within the scope and definition of Part 130 requirements. U.S. Ordnance will conduct a thorough review of this matter and will ensure that it is not repeated. Following the guidelines of 22 C.F.R. § 127.12, the company will provide the Office of Defense Trade Controls Compliance with a complete report within sixty (60) days of the date of this letter, unless we receive other guidance or instruction from you. With regard to any pending licenses, we will contact the Office of Defense Trade Controls Licensing in the next several days to provide any supplemental or updated information that they may require to complete their review.

## F. CONCLUSION

In summary, the financial benefits Mr. Debord, Sr. received from U.S. Ordnance were akin to the benefits any person similarly employed would receive. His employment with U.S. Ordnance was not sought by him, but was at the request of U.S. Ordnance. The ongoing indictment in Case No. 97-00239-MMC in no way barred Mr. Debord, Sr. from employment, and as an employee he was entitled to financial compensation. He deferred payment of his modest salary and total compensation until U.S. Ordnance was financially viable, and then received the compensation due him. A significant amount of U.S. Ordnance's sales were made to foreign entities because that was in accordance with the intended market for U.S. Ordnance's products as based on the product itself. All transactions were direct commercial sales, and many received support from the U.S. Government.

As explained in our Transaction Exception Request submitted to your office on June 8, 2004 (see Attachment O), three of U.S. Ordnance's pending licenses are pursuant to Plan Colombia, an important U.S. initiative. The U.S. cannot succeed in assisting countries like Colombia without the equipment supplied by companies like U.S. Ordnance. As the exclusive manufacturer and sole distributor of all models of the M60 Series machine gun, U.S. Ordnance is uniquely qualified to provide support to the U.S. Government's goals in Colombia. Without DTC approval for these licenses, U.S. foreign policy is undermined and the Colombian anti-narcotics and anti-terrorism missions are seriously compromised. U.S. Ordnance is a reliable defense trade partner with a clean export record, and wishes to fulfill its obligations to the Colombian Government without further delay.

Not only are U.S. Ordnance products important to Colombia and the foreign market, but the U.S. military remains the company's second largest customer. If U.S. Ordnance does not receive its export licenses the company will be forced to shut down. This will affect not only foreign customers, but will also have a serious impact on our domestic armed forces. U.S. Ordnance has always been proud to assist the United States Government and military in whatever capacity possible, and wishes to continue to do so. U.S. Ordnance has always been willing to work with the Office of Defense Trade Controls, and any other

government agency, in order to support our country's goals both at home and abroad. U.S. Ordnance should not be penalized for a lawful relationship with a former employee, and requests an immediate restoration of its good standing with DTC.

This whole matter has put in serious jeopardy the company's ability to stay open and provide jobs to approximately twenty-five employees in the Reno, Nevada area.

If you have any further questions, please contact me at (775) 356-2380, or our Washington Counsel, Mark Barnes, at (202) 626-0070.

Respectfully Yours,

Curtis Debord, Jr.
President, U.S. Ordnance, Inc.

cc:     Mark Barnes
        Bob Barr

EXHIBIT 6

**United States Department of State**

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

*Washington, D.C. 20522-0112*

JUN 2 4 2004

In Reply Refer To:
DTC Case No. RR 04-118

Mr. Curtis Debord, Jr.
President
U.S. Ordnance, Inc.
2500 Valley Road Unit Z
Reno, Nevada 89512
DTC Code: 14291

Reference:  My letter of June 2, 2004

Dear Mr. Debord:

In Deborah Carroll's June 2, 2004 letter to you, this office directed that you make a full disclosure concerning the relationship of Mr. Curtis Debord, Sr. to U.S. Ordnance, including but not limited to any involvement by him in export-related activities regulated by the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR). As you are aware, since August 1997, Mr. Debord, Sr. has been generally ineligible to participate in export activities as a consequence of having been indicted for violating and conspiring to violate the AECA (see Section 120.1(c) and (d) of the ITAR).

Subsequent to that letter, your attorney, Mr. Mark Barnes, contacted the Directorate of Defense Trade Controls (DDTC) seeking confirmation that U.S. Ordnance could use previously approved licenses or authorizations. Based on Mr. Barnes' contacts with DDTC, it appeared that U.S. Ordnance had completed the review required for the disclosure sought by Ms. Carroll's letter and had concluded that activities of Mr. Debord, Sr. were unrelated to those previously approved licenses.

We are now in receipt of your letter of June 21, 2004. It fails to address adequately our concerns about Mr. Debord, Sr.'s activities involving exports that are subject to licenses and other authorizations previously issued to U.S. Ordnance. Moreover, the information in your letter indicates that, from 2000 to very recently, Mr. Debord, Sr. was employed by U.S. Ordnance to serve as the Manager for sales and marketing and was actively involved in U.S. Ordnance's export activities with respect to defense articles. His activities may have resulted in applications and approvals of export licenses and these applications may have failed to disclose that an ineligible person (i.e., Mr. Debord, Sr.)

-2-

was a senior official, had a direct or indirect interest in the transactions, and might have obtained a benefit therefrom (*see* Sections 126.13(a) and 127.1(c) of the ITAR).

Accordingly, this constitutes our second request that U.S. Ordnance provide full and complete details of Mr. Debord's activities, both in his capacity as the Manager and otherwise, with respect to U.S. Ordnance, including by identifying all of the actual and proposed exports of defense articles that were associated in any way with his work. The dates and numbers of the relevant license applications and authorizations should be specified and copies provided.

In addition, in view of the foregoing, and pursuant to Section 38 of the AECA and Section 126.7(a) of the ITAR, this office is hereby **suspending** all licenses and authorizations previously issued to U.S. Ordnance. Upon receipt and review of the requested information, we will consider whether it is appropriate to lift this suspension. The transaction exception procedure noted in Ms. Carroll's letter that is applicable to applications for new licenses by U.S. Ordnance will also be applicable to the suspended licenses.

If you have any questions, you may contact Deborah Carroll at (202) 663-2809 or Peter Sullivan (202) 663-2831.

Sincerely,

David C. Trimble
Director
Office Defense Trade Controls Compliance

EXHIBIT 7



**United States Department of State**

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

*Washington, D.C.  20520-0112*

In Reply Refer To:
DTC Case Nos. RR 04-118 & TE 04-010

Mr. Curtis Debord, Jr.                                    JUL - 9 2004
President
U.S. Ordnance, Inc.
2500 Valley Road Unit Z
Reno, Nevada  89512
DTC Code: 14291

Reference:  Your Letter of July 1, 2004

Dear Mr. Debord:

We are in receipt of your letter of July 1, 2004, transmitted under cover of a July 2, 2004 memorandum from your attorney, Mr. Mark Barnes. Although both Mr. Barnes' cover memorandum and your letter contain certain representations regarding the three licenses for which U.S. Ordnance (USO) seeks transaction exceptions (TE), namely DDTC license applications 906696, 915794 and 910742, neither offers adequate explanation or substantiation for these representations. In addition, the information contained in this correspondence is not sufficient for DDTC to consider adequately your TE requests with regard to these applications. The attachment identifies those and other matters that USO should address in a supplemental submission in order for DDTC to consider your TE requests.

While the information sought in the supplemental submission is pertinent primarily to the pending TE requests, we strongly urge USO to provide as soon as possible the fuller disclosure seeks concerning all of Mr. Debord, Sr.'s activities (see my letter of June 2, 2004 and Mr. Trimble's letter of June 24, 2004), as well as the failure to report fees and other compensation as required by Part 130 of the International Traffic in Arms Regulations. It is likely that decision makers will want to have the full record available for their consideration before making a determination on the TE requests.

If you have any questions, please contact Deborah Carroll at (202) 663-2809 or Peter Sullivan at (202) 663-2831.

Sincerely,

Susan M. Clark for

David C. Trimble
Director
Office Defense Trade Controls Compliance

1

## Information Required But Not Provided by U.S. Ordnance's July 1, 2004 Submission

USO's July 1, 2004 submission was transmitted under cover of a memorandum of July 2, 2004, from USO's Attorney Mark Barnes. Mr. Barnes' memorandum says the attached disclosures by USO state that the three license applications subject to TE request (906696, 915794 and 910747 [the latter is an apparent typo and probably intended to refer to 910742] are "'routine reorders" for USO" and that Mr. Debord, Sr., "in his capacity as Sales and Marketing Manager, 'had no involvement' in this order and the only knowledge Mr. Debord, Sr., has regarding the transaction was that the reorder was made," and "no payment will be made to Mr. Debord, Sr." as a result of these transactions.

These conclusory representations are included in the attachment to Mr. Barnes' memorandum containing statements by Mr. Debord, Jr., on behalf of USO, but Mr. Debord, Jr. did not offer adequate explanation or substantiation for these representations.

With regard to the representations referenced above, USO should provide the following information:

- USO should address the basis of the characterizations of the substantial orders (worth over $3.6 million) subject to the TE requests as "routine reorders," and the role Mr. Debord, Sr. played in the earlier orders obtained from Columbian government and compensation he earned related to that work.

- All relevant information should be provided, including but not limited to the dates and nature of the activities by Mr. Debord, Sr., on trips to Columbia, (note the identities and affiliations of the persons with whom he met); the dates and nature of other communications by Mr. Debord, Sr. with respect to Columbia; the specific sales of defense articles by USO to Columbia and license requests that followed Mr. Debord, Sr.'s efforts; the details of any other activities by Mr. Debord in connection with such sales and export license requests; and the extent to which such sales were reflected in commission compensation he earned (whether or not payment was deferred).

  Please note that this is the level of detail that should also be provided in response to our broader request for the full disclosure of Mr. Debord, Sr.'s activities relating to sales and marketing of defense articles to customer other than Columbia.

- Since the contracts to which the three TE requests related were entered in 2003, while Mr. Debord, Sr. was still employed by USO, there is a question as to whether Mr. Debord, Sr. has voluntarily relinquished any claim of compensation and, if so, whether and how this is this documented. Also, USO should clarify

how "gross sales" was interpreted in determining Mr. Debord, Sr.'s annual commission compensation (i.e., whether his entitlement was upon entering a contract for sale or upon actual receipt of contract payments).

As to the disclosure concerning the omission of ITAR Part 130 fees and other compensations paid or payable to Mr. Vega Leon, d/b/a Sistemas y Equipos (SYE), please provide a complete copy of the agreement reference in Attachment A to Mr. Debord, Jr.'s letter of July 1, 2004.

We have noted previous USO license requests that identified SYE as a "foreign intermediate consignee." Please explain the role Mr. Vega Leon and SYE played and compensation received in those transactions and how it compares with the role in the three transactions subject to TB requests.

We understand that USO will be submitting a fuller disclosure concerning violations of Part 130 of the ITAR that may have occurred in transactions other than those covered by the pending TB requests. This further submission should address USO's policy and practice concerning retaining the services of persons engaged in brokering activities who are not registered pursuant to Part 129 of the ITAR. In this connection, we have no record that either Mr. Vega Leon or SYE have registered under Part 129.

We have noted that, on its website, USO states that it provides training, including a Machine Gun Operators Course and a M60 Armorer Course. The website also states that USO partners with Special Tactical Services. These courses, if provided to, foreign persons abroad or in the United States would appear to come within the definition of "defense service" in Section 120.9 of the ITAR and to be subject to the requirements for approval in Part 124 of the ITAR. Please provide details of any training provided during the past five years to foreign persons concerning (A) the assembly, testing repair, maintenance modification, operation, and use of defense articles and (B) military training of foreign units, regulator and irregular. Details should include, e.g., dates, nature and location of service, identities of persons trained including nationality and affiliation with foreign military organization) and whether Mr. Debord Sr. participated in any way in providing such training or in obtaining contracts for such training. Also, cite relevant ITAR approvals/authorizations, if any.

EXHIBIT 8

**United States Department of State**

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

*Washington, D.C. 20522-0112*

OFFICE OF DEFENSE TRADE CONTROLS COMPLIANCE
2401 E STREET, NW., SA-1, #1304
WASHINGTON, DC 20037

DATE SENT: _4/4/05_

TO: _Mark Barnes, Esq_

COMPANY/ORGANIZATION: _Counsel for USO & Delrod JR)_

SUBJECT: _USO et al DRAFT Charging letter_

PHONE: _202/626-0089_ FAX: _202/626-8088_

FROM: _Peter Sullivan_

PHONE: _202/663-2881_ FAX: _202/261-8198_

COMMENTS: _Before providing a draft Consent Agreement, the Trimble needs to know whether USO, Delrod Jr + Delrod Sr remain willing to proceed on the basis of the attached Draft CL. Please note this draft is subject to revision by DTC. A copy will be faxed to Mr Bier, Counsel for Delrod Sr._

Pages: _7_ (including cover sheet)

# DRAFT CHARGING LETTER

U.S. Department of State
Bureau of Political-Military Affairs
Directorate of Defense Trade Controls
Washington, D.C. 20520-0112

Mr. Curtis Lee Debord
President
U.S. Ordnance, Inc.
2500 Valley Rd.  (Suite Z)
Reno, NV 89512

Mr. Curtis Lynn Debord
12301 Interstate 80 E
Sparks, NV  89434

Dear Messr. Debord:

The Department of State ("Department") charges that Respondent, U.S. Ordnance
(hereinafter "USO"), Curtis Lee Debord (hereinafter "Debord Jr.") and Curtis Lynn
Debord (hereinafter "Debord Sr.") violated Section 38 of the Arms Export Control Act
(the "Act") (22 U.S.C. 2778) and the International Traffic in Arms Regulations (the
"Regulations") (22 CFR Parts 120-130) as described below.  At this time, thirty-five (35)
violations are charged against USO, Debord Jr. and Debord Sr.  The Department reserves
the right to amend this charging letter, which may include specifying additional
violations (see Section 128.3 of the Regulations).

## PART I - RELEVANT FACTS

(1)  USO is a corporation that was incorporated in July 28, 1997 under the laws of
Nevada to take over the business of manufacturing commercial collector-grade firearms
of American Arms/Delta, a company owned by Debord Jr.  USO is U.S. person within
the meaning of Section 120.15 of the Regulations.

(2)  Debord Jr. is President, Treasurer, Secretary and sole director and owner of USO and
is a U.S. person within the meaning of Section 120.15 of the Regulations.  Debord Jr. is
the son of Debord Sr.

(3)  On August 12, 1997, the Grand Jury for the U.S. District Court, North District of California, returned an indictment charging that Debord Sr., among other things, conspired to import firearms and firearms parts in violation of the Arms Export Control Act. This charge was included in superseding indictments returned by the Grand Jury for that Court on November 17, 1998 and November 29, 2001. As a consequence of the indictment, Debord Sr. has been and continues to be an ineligible person under the ITAR.

(4)  USO is engaged in the business of manufacturing and exporting defense articles (including machine guns covered by Category I(b) of the U.S. Munitions List) and furnishing defense services and, since February 2000, has been registered with the Department of State, Directorate of Defense Trade Controls (DDTC)[1] pursuant with Section 38 of the Act and Section 122.1 of the Regulations.

(5)  On or about July 30, 2000, Debord Sr. became a senior officer or official of USO, specifically Sales and Marketing Manager, and served in that position until on or about June 1, 2004. As part of his duties, Debord Sr. traveled to Columbia and other foreign countries to promote exports of USO-manufactured machine guns.

(6)  Under his employment contract with USO, Debord Sr. was entitled to a salary of $1,000 per week and bonus of 5% of gross domestic and foreign sales in each year sales exceed $1,000,000. In December 2003, USO paid Debord $1,048,000 of the $1,080,194 total amount USO then owed to him for salary and bonuses earned during the four years, 2000-2003. The vast majority of bonuses was derived from exports of defense articles, mostly machine guns and related parts sold to Columbia.

(7)  The transmittal letter, signed by Debord Jr., which accompanied USO's February 2000 registration statement with the DDTC, represented, among other things, that no senior officer or official of USO had ever been indicted for violating the Act. Following the hiring of Debord Sr. in July 2000, USO and Debord Jr., failed to notify the DDTC that Debord Sr., who was subject to indictment for violating the AECA, was serving as a senior officer or official.

(8)  Transmittal letters, signed by Debord Jr., which accompanied renewals of USO's registration statement with the DDTC in February 2002 and January 2004, signed by Debord Jr., stated, among other things, that no senior officer or official had ever been indicted for violating the Act.

---

[1] In February 2003, the former Office of Defense Trade Controls was realigned into the Directorate of Defense Trade Controls. References to the Directorate of Defense Trade Controls will deemed to be to Office of Defense Trade Controls wherever applicable.

(9)  At various times in the period from July 27, 2000 through June 1, 2004, USO applied to the DDTC for licenses or other approvals to export defense articles, including 14 for exports to Columbia, one to Italy and one to Thailand.[2]  The applications, signed by Debord Jr., stated that no senior officer or official of USO was subject to indictment for violating the AECA.

(10)  During the period July 27, 2000 through June 1, 2004, USO, Debord Jr. and Debord Sr., knew that Debord Sr. was under indictment for violating the Act and would and did benefit from and had a direct or indirect interest in exports for which USO request and obtained licenses or other approvals to export defense articles.  At no time did USO, Debord Jr. or Debord Sr. disclose these facts in writing to, or obtain written authorization to participate in such exports from, DDTC.  Such exports include, but are not limited to, those referred to in paragraph (9) above.

(11)  The facts relating to the association of Debord Sr. with USO were not voluntarily disclosed to the DDTC.  After learning of these facts, the DDTC initiated an investigation and ,on June 2, 2004, imposed a policy of denial on USO's applications for licenses or other approvals to export defense articles or services and, on June 24, 2004, suspended USO's outstanding export licenses.

## PART II - REGULATORY REQUIREMENTS

The following provisions of the Regulations adopted pursuant to Section 38 of the Act are relevant to the charges:

---

[2] 809677 (filed November 21, 2000, for export to Columbia of machine gun spare parts valued at $1,447,610, approved December 19, 2000); 838068 (filed November 19, 2001, for export to Columbia of machine guns and valued at $2,007,312, approved December 10, 2001); 838709 (filed November 26, 2001, for export to Columbia of machine guns and related parts valued at $376,976, approved December 13, 2001); 823778 (filed May 22, 2001, for export to Columbia of machine guns and related parts valued at $349,618, approved July 10, 2001); 849275 (filed March 22, 2002, for export to Italy of machine guns and related parts valued at $60,775, approved April 2, 2002); 850472 (filed April 4, 2002, for export to Columbia of machine gun parts valued at $66,583, approved April 10, 2002); 862957 (filed August 23, 2002, for export to Columbia of machine guns and related parts valued at $2,292,730, approved September 25, 2002); 863669 (filed August 30, 2002, for export to Columbia of machine guns and related parts valued at $84,816, approved September 25, 2002); 866293 (filed October 2, 2002, for export to Thailand of machine gun spare parts valued at $131,966, approved October 7, 2002); 891904 (filed May 29, 2003, for export to Columbia of machine gun spare parts valued at $7,195,544, approved October 6, 2003); 886513 (filed April 2, 2003, for export to Columbia of machine gun parts valued at $440,230, approved June 6, 2003); 877090 (filed December 20, 2002, for export to Columbia of machine gun parts valued at $192,603, approved January 16, 2003); 906696 (filed October 29, 2003, for export to Columbia of machine guns and related parts valued at $1,164,671, denied October 14, 2004); 910741 (filed December 10, 2003, for export to Columbia of machine gun spare parts valued at $124,393, approved January 15, 2004); 910742 (filed December 10, 2003, for export to Columbia of machines guns and related parts valued at $522,030, denied October 14, 2004); 915794 (filed January 29, 2004, for export to Columbia of machine guns and related parts valued at $1,976,110, denied October 14, 2004).

(12)  Section 38 of the Act requires persons engaged in the business of manufacturing defense articles or exporting defense articles and defense services to register in accordance with the Regulations; and prohibits the export of defense articles or defense services except in accordance with the Regulations

(13)  Section 120.1(c) of the Regulations provides that a person who is subject to indictment for violating the Act (or other statutes listed in Section 120.27 of the Regulations) is generally ineligible.

(14)  Part 122 of the Regulations requires the registrant to state whether any of its senior officers or officials has ever been indicted for violating the Act (or any other statutes listed in the Act); disclosure of such indictment is required to be included in a transmittal letter accompanying the registration signed by an authorized senior officer (Section 122.2) or in a notification within 5 days of such indictment (Section 122.4).

(15)  Section 126.13 of the Regulations requires that an application for an export license include a letter be signed by a responsible official empowered by the applicant stating whether any senior official is the subject of an indictment for violating the Act (or any other statutes listed in Section 120.7 of the Regulations).

(16)  Section 127.1(a)(4) of the Regulations makes it unlawful to violate any terms or conditions of a license granted pursuant to the Regulations, including the conditions set forth in Section 126.13.

(17)  Section 127.1(c) of the Regulations provides that a person with knowledge that another person is subject to indictment for violating the AECA (or is otherwise ineligible pursuant to Section 120.1(c) of the Regulations) may not, directly or indirectly, without prior disclosure of the facts to, and written authorization from, DDTC, participate in any transactions which may involve any defense article for which a license is required by the Regulations where such indicted (or otherwise ineligible person) may obtain any benefit therefrom or have any direct or indirect interest therein.

(18)  Section 127.1(d) of the Regulations provides that no person may willfully cause, or aid, abet, counsel, demand, induce or permit the commission of any act prohibited by or the omission of any act required by Section 38 or any regulation, license, approval or order issued thereunder.

(19)  Section 127.2 of the Regulations provides that it is unlawful to use any export control document containing a false statement or misrepresenting or omitting a material fact for the purpose of exporting any defense article or technical data or the furnishing of any defense service for which is license or approval is required.

## PART III - THE CHARGES

As described more fully in paragraphs 1 through 19, the following violations are charged to Respondents USO, Debord Jr. and Debord Sr.

### Charges 1-3:  False Statements and Omissions of Material Facts
### Relating to Registration

(20)  Respondents USO, Debord Jr. and Debord Sr., acting alone and in concert and aiding and abetting each other, violated Section 38 of the Act and Section 127.2 and 127.1(d), in three separate instances, by (A) failing to notify DDTC, as required by Section 122.4 of the Regulations, that USO had appointed Debord Sr. to serve as a senior officer or official of USO and that he was subject to indictment for violating the Act, and (B) by falsely stating in two letters required by Section 122.2 to accompany renewals of USO's Registration Statement that no senior officer or official of USO is subject to indictment for violating the Act.

### Charges 4-19:  False Statements Relating to Export
### License Applications

(21)  Respondents USO, Debord Jr. and Debord Sr., acting alone and in concert and aiding and abetting each other, violated Section 38 of the Act and Section 127.2 and 121.1(d) by falsely stating in 16 separate letters, required by Section 126.13 to accompany applications for export licenses, that no senior officer or official of USO is subject to indictment for violating the Act.

### Charges 20-35: Failure to Disclose and Obtain Approval of Participation in
### Exports in which an Ineligible Person May Benefit or
### Have an Interest

(22)  Respondents USO, Debord Jr. and Debord Sr., acting alone and in concert and aiding and abetting each other and knowing that Debord Sr. was indicted for violating the Act and would and did benefit from and had a direct or indirect interest in exports for which USO requested and obtained licenses to export defense articles, violated Section 38 of the Act and Sections 127.1(c) and 127.1(d), in 16 separate instances, by failing to disclose these facts in writing to, or obtain written authorizations to participate in such exports from, DDTC.  Such exports include, but are not limited to, those described in paragraph 9 above.

202 663 2921   P.36

## PART III - ADMINISTRATIVE PROCEEDINGS

(23)  Pursuant to Part 128 of the Regulations, administrative proceedings are instituted against Respondents USO, Debord Jr. and Debord Sr. for the purpose of obtaining an Order imposing civil administrative sanctions that may include the imposition of debarment and/or civil penalties.  The Assistant Secretary for Political-Military Affairs shall determine the appropriate period of debarment, which shall generally be for a period of three years in accordance with Section 127.7 of the Regulations, but in any event will continue until an application for reinstatement is submitted and approved.  Civil penalties, not to exceed $500,000 per violation, may be imposed in accordance with Section 38(e) of the Act and Section 127.10 of the Regulations. The Department of State's decision to pursue one type of enforcement action does not preclude it or any other department or agency of the United States from pursuing another type of enforcement action.

Sincerely,


David C. Trimble
Director
Office of Defense Trade Controls Compliance

EXHIBIT 9

Fwd: US Ordnance                    http://d04.webmail.aol.com/display-message.aspx?version=_SRV_1...

---

| | This message has been scanned for known viruses. |
|---|---|
| **From:** Mark817 | |
| **To:** KBMBassociates | |
| **Subject:** Fwd: US Ordnance | |
| **Date:** Thu, 26 May 2005 9:44:48 AM Eastern Daylight Time | |

---

Mark Barnes
Attorney at Law
1350 Eye St. N.W. , Suite 1255
Washington, D.C. 20005
Tel. (202) 626-0089
Fax (202) 626-0088
Pager: (800) 763-3595

This e-mail is confidential and is legally privileged. If you have received it in error, you are on notice of its
status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do
not copy it or use it for any purposes, or disclose its contents to any other person. To do so could violate state
and Federal privacy laws. Thank you for your cooperation. Please contact Mark Barnes & Associates at
202-626-0089 if you need assistance.

Attached Message
From:    Slygh, Patricia C :
To:      'Mark817@aol.com'
Subject:  RE: US Ordnance
Date:    Thu, 26 May 2005 07:17:46 -0400

Mark,  In response to your status query on US Ordnance and the DeBords,
David has directed Peter and I to temporarily suspend any work on the
proposed consent agreement/charging letter.  The Department of Justice has
asked him to do so as they are looking at related files.  That is all that
Peter and I know at this time.  We will keep you posted as we learn more.
Pat.

EXHIBIT 10

# Robert E. Sanders

*Attorney and Counselor at Law*
*P.O. Box 25385*
*Winston-Salem, NC 27114*

Robert E. Sanders, Esquire
Member District of Columbia Bar
Member Illinois Bar

telephone (336) 671-0072
facsimile

CERTIFIED MAIL 7003 1010 0049 0006 0089

July 9, 2005

Mr. David C. Trimble
Director, Office of Defense Trade Controls – Compliance
Bureau of Political-Military Affairs
U.S. Department of State
Washington, D.C.

Washington, D.C.

RE:   U.S. Ordnance, Incorporated

Dear Mr. Trimble:

Thank you for accepting my call last Friday. I placed the call on behalf of U.S. Ordnance, a business incorporated in the State of Nevada and a registrant of the Department of State Defense Trade Controls. My purpose in calling was to introduce myself; to inform you that I have only recently been retained to represent U.S. Ordnance and, being a new player on the field, I was seeking to familiarize myself with the ground rules. I did not call to discuss substantive matters but merely to learn how you would like interaction between regulator and the regulated to proceed. I write now to follow up our brief telephone conversation.

My conversation with you was brief, I never did get to the subject I called about but I was left with the clear impression that you were somewhat annoyed and irritated that I called at all. I hope that is not so but I can understand such a reaction if you thought I was calling to blind side you into talking about a case without adequate preparation. To the extent that I may have given that impression, I apologize and want to assure you that I know better and further assure you that it was my intent to talk about process, not substance.

I will not take up much of your time with this letter, either; it will be brief and to the point. Please consider this a formal complaint of non-feasance. Simply stated, U.S.

Mr. David C. Trimble

July 9, 2005

Page2

---

Ordnance is submitting applications to export products and such applications are not being processed. For some time now, the applications of U.S. Ordnance have been ignored. The applications, prepared and submitted in conformance with all existing guidance, have somehow been finding their way into a black hole. I conclude that the cause may be an aberration of an official policy, procedure, or practice within your organization of which you may or may not be aware. I trust that such procedures or practices are the unintended consequences of organizational misinterpretations of policy directives and may be easily corrected.

The business of U.S. Ordnance requires it to register with DTC and to obtain licenses from DTC before exporting its products. Registration confers no substantive rights or privileges to the registrant but, if nothing else, the act of registration confers the expectation that the processes that are due, whatever they may be, are applied fairly and even handedly to all. The conscious decision by a government agency to discriminate against a small business, to simply refuse to process its applications without reason or process, is the functional equivalent of capital punishment. for a business expecting action and dependent upon action. The simple act of doing nothing is the most insipid and cruel punishment which a bureaucracy can administer. You will immediately recognize the financial consequences and the erosion of good will resulting from the inability of any business to perform on contracts. U.S. Ordnance waits, waits and then waits some more for licenses which never come and has never received an explanation from anyone. That is wrong and can not stand. It is not my purpose to question the authority of DTC to deny requests to export if issuance of a license conflicts with the law, regulations and/or the foreign policy of the United States. However, U.S. Ordnance, and all other DTC Registrants have a right to expect action on applications within a reasonable time. DTC has a correlative duty to take action, to process applications either approving or denying them within the same reasonable time. In other words, the timely processing of applications submitted by registrants is the *sine qua non* of their ability to do business. know you will agree that the destruction of United States businesses is not a proper role of the United States government. This would be especially egregious if the laws, regulations, rulings, etc were not being applied equally to all registered businesses.

I would like to talk to you or otherwise communicate with you in order to better understand your expectations for interaction and to make known to you the expectations

Mr. David C. Trimble

July 9, 2005

of my client. I would appreciate an expedited explanation as to why U.S. Ordnance applications are not being processed. I expect to be in Washington, D.C. around the end of the month and would be most appreciative if you and/or Mr. Buzby could find time for a brief visit or if you could set up a meeting with Ms. Slygh or other members of your staff. I believe that it would be of mutual benefit to establish ground rules at least for communication and interaction. I look forward to hearing from you.

Sincerely,

/s/

Robert E. Sanders

RES/ag
Enclosures:  none
cc:    U.S. Ordnance