**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

U.S. ORDNANCE, Inc.            )
                               )
                               )
        v.                     ) Case No. 1:05CV02304 (ESH)
                               )
                               )
U.S. DEPT. OF STATE, et al.    )
_____)

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

1.  FACTS AND PROCEDURAL HISTORY

The Defendants move the Court to dismiss Plaintiff's claims for lack of subject matter jurisdiction and present four arguments in support thereof:

1ST ARGUMENT   The Case is moot because four months after this action was filed, DOS denied all pending "transaction exception" license applications. By letter dated March 10, 2006, DOS denied all pending applications which it had refused to process since imposing a "Policy of Denial" in June of 2004;

2ND ARGUMENT   The Court lacks jurisdiction to review the denial of a license application under ITAR because the act of granting or denying a license is a discretionary function committed to the DOS;

3rd ARGUMENT   The Court lacks jurisdiction because a formal administrative action is contemplated by DOS; and

4th ARGUMENT   The Court lacks jurisdiction to issue a declaratory judgment that US Ordnance is in compliance with the ITAR because the issuance or denial of a license is a discretionary act and the decision to determine if a party is in compliance is a discretionary act.

The core of the complaint is the deprivation of Plaintiff's Due Process rights guaranteed by the Fifth Amendment. The Government treats the due process underpinnings in footnote 20 (Defendants' Motion to Dismiss, page 19) in which it asserts that the claim is not ripe. The Government contends that the draconian penalties imposed upon Plaintiff do not require due process. The Government also contends that the penalties imposed upon Plaintiff for twenty-two (22) months by a "policy of denial" is not a *de facto* debarment. The Government draws the distinction but does not offer any grounds for concluding that there is a difference. The Government simply asserts that the Plaintiff has not been debarred and will be afforded due

process when a forthcoming administrative proceeding is commenced.

### A.     POLICY OF DENIAL ADMITTED

The June 2, 2004 letter from DDTC to U.S. Ordnance (Mot to Dismiss, Exhibit 1) imposed a "policy of denial[1]" under the ITAR. (Mot to Dismiss, Page 4, first paragraph). The letter makes no reference to a "policy of denial" but informs Plaintiff that from that point forward, "...this Office is prepared to consider, on a case-by-case basis, processing license applications as "transaction exceptions.[2]" The same letter explains that, to qualify for a "transaction exception," the applicant must establish that the transaction meets these vague and ambiguous standards:

– there are overriding U.S. foreign policy or national security interests;

– the exception would further law enforcement concerns that are consistent with the foreign policy or national interests of the U.S.; or

– there are other compelling concerns that are consistent with the foreign policy or national security interests of the U.S. and law enforcement concerns.

It is clear that the "policy of denial" changed the legal status of Plaintiff and eliminated its ability to conduct any business which involved export. The Plaintiff's legal status before notice of the "policy of denial" was that of a compliant Registrant; one in good standing and whose applications for export licenses were routinely approved. Plaintiff's new status was that of a blacklisted pariah; a business whose applications the DOS refused to process and whose valid

---

[1] The term "policy of denial" is not found in statute, 22 U.S.C. 2778, or regulation, 22 C.F.R. 120 *et seq.*, ITAR. Section 126.7 sets forth the policy of the DOS with regard to applications to export defense articles. Licenses **shall be** denied or revoked whenever required by any statute and Licenses **may be** revoked whenever certain other conditions exist. The administrative procedures for implementing this policy are found in Section 127.8, Procedures for "Interim Suspension, and in Section 128.1 *et seq.*, "Administrative Procedures."(emphasis added)

[2] The term "transaction exception" is not found in statute, 22 U.S.C. 2778, or regulation, 22 C.F.R. 120 *et seq.*, ITAR. Section 127.11(a) provides creates a presumption of denial for licenses submitted by persons who have been **convicted** of certain enumerated offenses; Subsection (b) provides for an exception for persons who have been **convicted**. (emphasis added)

licenses were revoked.  The vacuous invitation to submit applications as "transaction exceptions" did nothing to alter the changed status.  The standards to qualify for a "transaction exception" are so vague and ambiguous as to be left to the unbridled discretion of the Office.  Even the transaction exception applications, submitted in good faith by Plaintiff, were not processed.  All were denied by DOS, on December 21, 2005, after the commencement of this civil action.

The imposition of such a penalty without resort to the due process safeguards within the ITAR was *ultra vires* and unlawful.  It is the functional equivalent of the formal penalty of Debarment [3], a sentence which only the Assistant Secretary of State for Political/Military Affairs is authorized to impose only after an accused has been afforded due process protections within the detailed administrative procedures in Section 128.  Debarment shall generally be for a period of three years, ITAR, Section 127.7.  The imposition of a punishment of debarment before compliance with ITAR's administrative procedures deprived Plaintiff of Constitutional Fifth Amendment due process; the right which Section 128 is intended to ensure.  The Plaintiff's changed legal status under the "policy of denial" continues.  The punishment is based on raw accusation, a suspicion that Plaintiff had a legal duty to disclose certain information to the DOS when submitting registration documents and applications to obtain export licenses.  Plaintiff did not disclose such information to DOS resulting in what is, in the worst case scenario, a benign technical regulatory infraction which is amenable to being corrected.  The failure to disclose did not involve an illegal export or an attempt to illegally export; it did not involve export or an attempt to export illegal products; it did not involve export or an attempted export to a prohibited government or end user; and, it did not involve fraud or any attempt to mislead about a material fact.  At the same time that the DOS is accusing Plaintiff of regulatory infractions the DOS has flagrantly failed to comply with its own regulations and thus deprived Plaintiff of due process.  DOS is not empowered to choose which of its own regulations it likes and which it may ignore.  As an Executive Branch agency it has a duty to faithfully execute the laws  – all the laws --

---

[3] Debarment means a prohibition from participating in the export of defense articles for which a license is required.  **"Any such prohibition is referred to as a debarment..."** ITAR, § 127.7

1  entrusted to it.

2      All accusations against Plaintiff flow from an at will contract of employment between Plaintiff and Debord Senior which lasted from July 2000 through June 1, 2004. Debord Senior's decision to accept employment with U.S. Ordnance was openly arrived at and it was done without any attempt to conceal or mislead. For the entire period of his employment, Debord Senior was under the pre-trial supervision of the United States District Court in San Francisco. Prior to accepting employment, he sought and received the approval to accept a job with U.S. Ordnance from the prosecutor, Assistant United States Attorney William Schaefer. He then petitioned the Court for permission and made full disclosure to the Court of the nature of his employment. The full facts of his employment, including foreign travel and the need for the return of his passport, were made known to all concerned Criminal Justice components including Pre-Trial Services of the United States Probation Offices in San Francisco and in Reno, Nevada, his place of residence. The express approvals of all involved in supervising his conditions of release would provide assurances to any reasonable person to conclude that his job with U.S. Ordnance was lawful and, in fact, was looked upon favorably by those who were supervising his behavior and who were in a position to know the details of his criminal case and his employment arrangement. In the period of employment with Plaintiff, Debord Senior was to make more than twenty-five trips out of the country. Each time he left the area of his residence, he was required to give prior notice of his travel plans, his places of lodging and activities to Pre-Trial Services. During the entire period of pre trial supervision, more than eight years [4], Debord Senior compiled an unblemished record of compliance. The Investigative agency in the criminal case was the United States Customs Service who monitored his comings and goings, his entries and departures. Prior to entering the contract of employment, Debord, Junior was told that the employment had been approved by the Court and had every reason to rely on that knowledge in

---

[4] All counts in Debord Senior's criminal case in San Francisco were dismissed with prejudice in June 2005. The Government filed a timely notice of appeal but did not file an Appellant's Brief. On March 3, 2006, the Government filed a motion to dismiss the appeal. That motion is pending.

entering the employment contract.

Estoppel, an equitable doctrine invoked to avoid injustice in particular cases, applies to Plaintiff's employment of Debord Senior. The party claiming estoppel must have relied on the conduct of its adversary, in this case the U.S. Governent, "in such a manner as to change his position for the worse." and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading. *See*, Wilber National Bank v. United States, 11 U.S. 655, 670-675 (1973) (criminal defendant may assert as a defense that the government led him to believe that its conduct was lawful.); Brandt v. Hickel, 427 F.2d 53, 57 (CA9 1970) ([for one segment of the government] to say to the appellant, the joke is on you. You shouldn't have trusted us, is hardly worthy of our great government.); Heckler v Community Health of Crawford County, Inc., 467 U.S. 51, 62 (1984) (When a private party is deprived of something to which it was entitled of right, it has surely suffered a detrimental change in its position. Estoppel doctrine applied when respondent lost no rights but merely was induced to do something which could be corrrected at a later time.)

– **CHANGE OF STATUS**

The issue in this case is whether the DOS changed the legal status of the Plaintiff when it imposed its "Policy of Denial?;" whether the DOS blacklisted US Ordnance from obtaining export licenses without affording it the mandated procedural safeguards in ITAR, the purpose of such safeguards is to ensure notice of the grounds for the blacklisting and an opportunity to answer the accusations which are the grounds for the blacklisting. The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. Marshall v. Jerrico, Inc., 446 U.S. 238 (1980). This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision making process. See Carey v. Piphus, 435 U.S. 247, 259-262, 266-267 (1978). The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. See Mathews v. Eldridge, 424 U.S. 319, 344 (1976). At the same time, it preserves both the appearance and

reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 172 (1951) (Frankfurter, J., concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.

A government action that potentially constrains future employment opportunities must involve a tangible change in status to be actionable under the due process clause. If a government action does constitute an adjudication of status under law, the underlying factual and legal determinations are subject to due process protections. Joint Anti-Fascist Committee, 341 U.S. at 171-72, "That a conclusion satisfies one's private conscience does not attest its reliability. The validity and moral authority of a conclusion largely depends on the mode by which it was reached. Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done."(Frankfurter, J., concurring), See also *id.* at 179, "It is procedure that spells much of the difference between rule by law and rule by whim or caprice." (Douglas, J., concurring), and *id.* at 186, "to promulgate with force of law a conclusive finding of disloyalty, without {a} hearing at some stage before such finding becomes final, is a denial of due process of law."

– **LIBERTY INTEREST**

The gravamen of this charge is that the unlawful action of the DOS caused the termination of Plaintiff's foreign export business and barred it from conducting business with all

foreign governments. It is clear that the "Policy of Denial" imposed by DOS was a binding determination to exclude Plaintiff from all future ability to export its products and thus exclude Plaintiff from future contracting with foreign governments. The Government admits that in its brief urging the Court to dismiss the complaint. The D.C. Circuit found interference with a constitutionally protected right to follow a chosen trade or profession, implicated a Fifth Amendment liberty interest" in <u>Kartseva v. Department of State</u>, 37 F.3d 1524, 1530 (D.C. Cir. 1994) a case in which the DOS disqualified the Plaintiff, a Russian translator who was employed by a DOS subcontractor, from participation on DOS contracts due to concerns raised in a National Security background check. The Court found that there were two ways in which the action of DOS might have changed Kartseva's status and thus implicated a liberty interest. First, if State's action excludes Kartseva from work on some category of future State contracts or from other government employment opportunities, that action changed her formal legal status and thus implicated a liberty interest. Second, if State's action did not have this binding effect, but nevertheless has the broad effect of largely precluding Kartseva from pursuing her chosen career as a Russian translator, that, too would constitute a "status change" adequate to implicate a liberty interest. Here, the "Policy of Denial" qualifies under both theories. First the refusal to process Plaintiff's applications to export its products barred Plaintiff from pursuing any sales of its product which required exportation, the primary target of its marketing strategy. Second, State's action had the effect of precluding Plaintiff from pursuing sales of any of its products to a foreign government. In Kartseva, as here, DOS had taken no official debarment action under the public rules governing public contracting. The Court noted that if it had, she would have been entitled to the procedural safeguards mandated by regulation. Despite that denial, the Court held

that Kartseva has a cause of action for violation of her due process liberty interest if she could establish that State's action was a determination of her legal ineligibility to work on future State contracts.  *See*, Aleutian Airways v. United States, 982 F.2d 594, 598 (D.C. Cir. 1993) (suspension from one government department implicates a liberty interest.)

**ARGUMENT**

I. **THE ACTION BY THE DEPARTMENT OF STATE IN RETURNING THE PENDING APPLICATIONS DOES NOT MOOT THE ISSUE BECAUSE THERE IS A REASONABLE EXPECTATION THAT USO WILL BE SUBJECTED TO THE SAME ACTION AGAIN AND DECLARATORY RELIEF IS NECESSARY**[5]

On March 10, 2006, the Department of State (State) returned nine export license applications to U.S.O. (Gov't Exhibit 15) based on its current "policy of denial" for all U.S.O. applications and by that fact the government now argues that the instant case is moot because the "State Department, through DDTC, exercised its discretion and denied plaintiff's pending

---

[5]On December 9, 2005, undersigned counsel agreed to consolidate the plaintiff's Motion for Preliminary Injunction with the trial in this matter to ease the burdens on both sides of the litigation and avoid duplicate litigation and to give the defendant time to file his dispositive motion.  At the time counsel agreed to the consolidation there was an mistaken belief on his part that the parties would maintain the *status quo* pending the outcome.  Since the case law is clear that the issue is not moot counsel will not address the appropriateness of the return of the applications while the case was pending.

DISMISSANS.FIN.wpd

applications." (Gov't motion at 9).  However the return of those applications does not moot the State Department's "policy of denial" which was instituted on June 4, 2004, (See Gov't Exhibit 1), reiterated in the March 10, 2006, letter and continues to today.

"When a plaintiff attacks an isolated action rather than an ongoing policy 'the resolution of the claim moots any request for declaratory relief." *Fraternal Order of Police, D.C. v. Rubin*, 134 F.Supp.2d 44 (D.C. C. 2001).  By their actions in returning the nine applications the Department of State has attempted to moot the issue before the court but State has not addressed its "policy of denial" which the instant action seeks to address.  The Department of State has an ongoing "policy of denial" and the simple return of the nine applications has done noting to resolve the instant issue.

In *City of Houston, Texas v. Department of Housing and Urban Development*, 24 F.3d 1421 (D.C. Cir. 1994) the D.C. Circuit addressed the issue of mootness and a request for declaratory relief.  In that case the court stated "It is well-established that if a plaintiff challenges both a specific agency action and the *policy* that underlies that action, the challenge to the policy is not necessarily mooted merely because the challenge to the particular agency action is moot." *Id*. At 1428. (Emphasis in original). ( *See also Payne Enters. V. United States*, 837 F.2d 486 (D.C. Cir. 1988) and *Better Gov't Ass'n. v. Department of State*, 780 F.2d 86 (D.C. Cir. 1986) and that ". . . if a plaintiff's allegations go not only to a specific agency action, but to an ongoing policy as well, and the plaintiff has standing to challenge the future implementation of that policy, then declaratory relief may be granted if the claim is ripe[6] for review.  *Id*. At 1430.

---

[6]The framework for assessing ripeness was established in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967) in which the Supreme Court provided a two-pronged test that requires a reviewing court to evaluate "both the fitness of the issue for judicial decision and the

In their motion the defendant cites several cases purporting to stand for the proposition that the return of the applications has mooted the instant matter.  However, these cases all involve situations where the plaintiff was attacking an isolated action and not an ongoing policy.  *Barabski v. Buckles*, No. 02-0073 (HHK) (D.D.C. Oct. 31, 2002) (a single shipment of firearms); *Beehive Telephone Co., Inc.,* 1999 WL 1215782, (D.C. Cir. Nov. 5 1999), (agency denied request for consideration.  No apparent policy involved); *U.S. ex rel. Chicago Great Western R.R. Co., v. I.C.C.* 294 U.S. 50 (1935), (single agency action no challenge to policy); *DeFunis v. Odegaard* 416 U.S. 312 (1974),(law student would graduate regardless of the outcome of the litigation); *Columbian Rope Co. V. West*, 142 F.3de 1313 (D.C. Cir. 1998) (contract was already completed); *Action on Smoking & Health v. Dep't of Labor*, 28 F.3d 162 (D.C. Cir. 1994) (claim was moot once OSHA issued a notice of proposed rulemaking however no policy question involved).

II.     **THIS COURT HAS JURISDICTION TO REVIEW AGENCY ACTION WHICH IS UNLAWFULLY OR UNREASONABLY DELAYED, ABUSE OF THEIR DISCRETION AND NOT IN ACCORDANCE WITH LAW**

---

hardship to the parties of withholding court consideration."  In the instant matter the claims raise purely legal questions involving the interpretation of the ITAR and are therefore "presumptively suitable for judicial review."  *City of Houston Id.* at 1431.  As concerns hardship to the parties U.S.O. continues to lose income and is unable to generate future income due to the agencies actions.

Part II of the government's motion alleges that the actions by the Department of State in denying the applications is committed to that agencies' discretion and the court lacks jurisdiction to hear an Administrative Procedures Act (APA) challenge to that discretion. This assertion ignores the plain reading of the APA and the governing caselaw.

Section 706 of the APA states:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall –
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be –
>
> (A) arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law
>
> (B) contrary to constitutional right, power, privilege, or immunity;
> . . . .
>
> (D) without observance of procedure required by law
> . . . .

The defendants in this action have violated the APA by unlawfully withholding or unreasonably delaying actions on their applications in violation of 5 U.S.C. §706(1), have abused their discretion in failing to act or denying the plaintiff's applications in violation of §706(2)(A)[7]

---

[7]This issue will be discussed in Part III *infra*.

and have denied the plaintiff procedure required by law in violation of §706(2)(D).

The State Department references Section 38 of the Arms Export Control Act and Section 126.7(a) of the International Traffic in Arms Regulations (Gov't Exhibit 15) as the basis of the denial of the applications. By reference to the "Draft Charging Letter" (Gov't Exhibit 11) the applications were denied because Curtis Lynn DeBord (DeBord Sr.) was a Marketing Manager for U.S. Ordnance.

In its Draft Charging Letter the Department of State has alleged 35 violations of the Arms Export Control Act (AECA) and its implementing regulations the International Traffic in Arms Regulations (ITAR) 22 CFR Subchapter M Parts 120-130. U.S. Ordnance has not violated any section of the AECA or its regulations.

Charges 1-3 allege that U.S. Ordnance, Curtis Lee DeBord and Curtis Lynn DeBord violated Section 38 of the AECA and sections 127.2 and 127.1(d) of the Regulations by failing to notify the DDTC on three separate instances that DeBord Senior had been appointed to serve as a senior officer or official of USO and that he was subject to indictment for violating the Act and by falsely stating in two letters required by Section 122.2 that no senior officer or official of U.S.O. is subject to indictment for violating the Act.

Section 122.2 of the ITAR requires a transmittal letter signed by an authorized senior officer stating whether:

> . . . the intended registrant, chief executive officer, president, vice presidents, other senior officers or officials (*e.g.* comptroller, treasurer, general counsel) or any member of the board of directors:
>
> (I) Has ever been indicted for or convicted of violating any of the U.S. criminal statutes enumerated in §120.27 of this subchapter; . . .

Although we concede that DeBord Senior was indicted for violations of criminal statutes enumerated in §120.27 his position as Marketing Manager, a salaried employee, does not elevate him to the position of "registrant, chief executive officer, president, vice president or other senior officer(s) or official(s) of U.S.O.

Charges 4 through 19 allege 16 separate instances of violations of §§127.2 and 121.1(d) of the regulations by falsely stating in separate letters required by §126.13 of the regulations that no "senior officer or official of USO is subject to indictment for violating the Act."

Section 126.13 of the regulations requires a letter signed by a responsible official empowered by the applicant and addressed to the Directorate of Defense Trade Controls, stating whether:

> (1) The applicant or the chief executive officer, president, vice-
> presidents, other senior officers or officials (*e.g.* comptroller,
> treasurer, general counsel) or any member of the board of directors
> is the subject of an indictment for or has been convicted of
> violating any of the U.S. criminal statutes enumerated in §120.27
> of this subchapter. . . .

As noted above Mr. DeBord Senior as marketing manager does not fit the definition in section 126.13(a)(1) and no notification is required under that section of the ITAR.

Charges 20 through 35 allege 16 separate instances where U.S.O. failed to disclose that DeBord Senior had been indicted for violating the AECA and did benefit from and had a direct or indirect interests in exports for which U.S.O. requested and obtained licenses

thereby violating sections 127.1© and 127.1(d) of the regulations.

ITAR §127.1(c) provides that it is a violation of the AECA when "A person with knowledge that another person is then ineligible pursuant to §120.1(c) of this subchapter or §126.7 of this chapter. . . ." A review of these sections reveals that they are not applicable to U.S.O., DeBord Senior or DeBord Junior.

ITAR §120.1(c) concerns itself solely with the eligibility of persons "who may be granted licenses or other approvals." DeBord Senior in all of the license applications was not the person who was requesting the applications. Indeed, DeBord Senior was not listed on any of the license applications. Because DeBord Senior was not the "person" "who may be granted a license" this regulation does not apply to him.

Finally ITAR 126.7 provides that it is a violation if an "(6) An applicant, any party to the export. . . .or any person who has a significant interest in the transaction has been debarred, suspended, or otherwise is ineligible to receive an export license. . . . " Three issues are raised by this particular regulation which make this regulation inapplicable to this matter.

First, DeBord Senior was at the time of the applications the Sales and Marketing Manager for U.S.O. In this capacity he received a salary and a bonus of 5% of gross domestic and foreign sales in each year sales exceeded $1,000.000.00. Paragraph 10 of the "Draft Charging Letter" alleges that DeBord Senior was serving as a "senior officer or official." In fact Mr. DeBord Senior was not a senior officer or official he was merely a salaried employee entitled to a bonus for sales. ITAR 126.7(e) provides a definition to the term "party to the export" That term means:

> (1) The chief executive officer, president, vice-presidents, other senior officers and officials (*e.g.*, comptroller, treasurer, general counsel) and any member of the board of directors of the applicant.
> . . .

Clearly DeBord Senior does not fall into any of these definitions.

Second, this section is so vague and contradictory as to be unconstitutional. "Significant interest" is not defined by the statute or regulations. Nor does it appear that it has been interpreted by any court. The *American Heritage Dictionary of the English Language* defines "significant" as "Having or likely to have a major effect; important:" By virtue of a salary and a bonus Mr. DeBord Senior cannot be said to have a "significant" interest in the transaction.

Third, there has never been a finding that DeBord Senior was ineligible under the ITAR. ITAR §120.1(c) provides that a person who is subject to indictment for violating the Act is "generally ineligible." "Generally ineligible" is not defined by the act or regulations. Not only is this section vague it imputes knowledge to the applicant (here DeBord Junior) that an employee is barred under the statute. This is a criminal statute but it has shifted the burden of proof to DeBord Junior to prove that DeBord Senior is either eligible under the Act because the indictment is not an outright bar or, even more to the point, to show that DeBord Senior was not a ". . . person who has a significant interest in the transaction.. . . "

The policy of denial instituted by the Department of State is based exclusively on the previous indictment of DeBord Sr. for violations of the AECA notwithstanding the fact that the policy of denial is predicated on the indictment the defendant alleges that the Department of

State is merely using its discretion in denying the applications. It is conceded that the APA does not provide for jurisdiction where an agency action is committed to agency discretion (5 U.S.C. §701(a)(2), however the reasoning for that is that there is no justiciable standard by which a court may review the agency's decision. *Webster v. Doe*, 486 U.S. 592 (1988); *Heckler v. Chaney*, 470 U.S. 821 (1985). Where, as here, the Department of State has instituted a policy of denial based upon the AECA indictment of DeBord, Senior the policy of denial is not based on the agencies discretion but their perceived violation of the AECA and the ITAR.

In their motion the United States alleges that the Department of State can exercise its discretion to control the export and import of defense articles and defense services "[i]n furtherance of world peace and the security and foreign policy of the United States." (Gov't motion at 12). However no where does the defendant show that the denial of the applications is in furtherance of world peace and security and foreign policy of the United States. This is something they cannot show because the basis of the policy of denial is the AECA indictment of DeBord Senior.

Finally, in their motion the defendant states that "The AECA further authorizes the President to exercise his discretion in denying a license to export defense articles if the president determines that an applicant for a license is the subject of an indictment for violations of certain specified statutes. . . ." Citing 22 U.S.C. §2778(g)(3). Although the defendant has correctly stated the law the defendant has erroneously identified Curtis Lynn DeBord (Senior) the "applicant" for the applications. As stated 2778(g)(3) permits the President to deny a license to an applicant that "is the subject of an indictment for a violation of any of the statutes . . . ." U.S. Ordnance, Inc. and its owner and sole stockholder Curtis Lee DeBord (Junior) is the applicant on

all of the applications. Curtis Lynn DeBord (Senior) is not an applicant and is not listed anywhere on the application or its accompanying documents and he should not be by virtue of his salaried position as a Marketing Manager.

**III.  THE DEPARTMENT OF STATE HAS UNREASONABLY DELAYED FINAL AGENCY ACTION AND THERE IS NO EXPECTATION OF RESOLUTION**

The Department of State has known about DeBord Senior's position at U.S.O. since May, 2004. During the subsequent 22 months the State has had every opportunity to institute proceedings in accordance with ITAR §128 but have failed to do so. Even after the instant suit was filed the Department of State took the extraordinary action of returning the applications pending before it. This action by State is just one of many during the last 22 months that State has used to avoid the procedures dictated by the ITAR. Since May, 2002, U.S. Ordnance has been under a "policy of denial" which has resulted in a *de facto* debarment of U.S.O. In their motion the defendant claims that as a result of the return of the pending applications "there is no pending agency action that has been withheld." (Gov't motion at 17, Note 19). The defendant now apparently takes the position that there is nothing pending before the DDTC and the Department of State can institute formal debarment proceedings whenever it pleases.

Some of the delay in this matter can be attributed to the Department of Justice. On May 26, 2005, former counsel of U.S.O. received an e-mail from Patricial C. Slygh at the DDTC advising counsel that the Department of Justice had asked Mr. Trimble to "suspend any work on the proposed consent agreement/charging letter." (Gov't Exhibit 9, page 65). As a

17

result of the e-mail from Ms. Slygh and with no action having been taken in the ensuing five months counsel for U.S.O. wrote to the Assistant Secretary of State Bureau of Political-Military Affairs (the Bureau ultimately responsible for debarments) to attempt to resolve the matter.  No action was taken as a result of the letter.  As a response the Assistant Secretary responded that the "current proceedings will continue."

On October 26, 2006, some action was finally taken by the Department of State. On that date State apparently wrote to Curtis L. Debord, Junior and Senior advising them that they will continue the "policy of denial" and providing them with a "Draft Charging Letter." However, the letter allegedly written and dated October 26, 2006, was not mailed until November 22, 2006, and was not received by the DeBords until November 29, 2006.  (Exhibit 1). By the time the DeBords had received the October 26, 2006, letter the instant complaint had already been drafted and was ultimately filed the next day.

In this matter the defendants have had a clear duty to act but have failed to do so and the delay has been unreasonable.  The courts have held that they will "interfere with the normal progression of agency proceedings to correct "transparent violations of a clear duty to act.'" *In re:  American Rivers and Idaho Rivers United*, 372 F.3d 413, 418, (D.C. Cir. 2004).  *See also, Telecomms, Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) which provided the standard for unreasonable delay.   Here the delay has totaled 22 months and the defendant now takes the position that the return of the applications on March 10, 2006, without any action has eliminated any argument that the agency has unlawfully withheld agency action.

(Gov't motion page 17, Note 19).[8]

## IV. THE COURT CAN COMPEL AGENCY ACTION UNLAWFULLY WITHHELD

The Administrative Procedures Act section 706 gives this court the power to compel agency action unlawfully withheld or unreasonably delayed. This court has the inherent power to order the State Department to process the plaintiff's applications. The defendants have unlawfully withheld approval of the applications and unreasonably delayed or ignored any action to resolve this issue. In *Art-Metal USA, Inc v. Solomon*, 473 F.Supp 1 (D.D.C. 1978) the district court granted a preliminary injunction to enjoin further unlawful acts of a *de facto* debarment by the General Services Administration and ordered them to reinstate a contract award wrongfully terminated and to allow the plaintiff to bid, receive, and maintain contracts in the same manner and under the same standards applicable to other contractors unless and until debarment or suspension proceedings are properly initiated. . . . " *Id.* at 9.

## **CONCLUSION**

WHEREFORE, this court should deny the defendant's motion to dismiss.

---

[8] In their motion the defendant admits that "This exercise of discretion to impose a policy of denial is separate and distinct from a 'debarment,' which is authorized as a penalty for violations of the AECA and the ITAR once there has been a formal administrative proceed.ing" (Gov't motion at 18). This seems to buttress the plaintiff's argument that the policy of denial is a final action separate and apart from debarment.

Respectfully submitted,

_____/s/_____
Joseph R. Conte, Bar #366827
400 Seventh St., N.W., #400
Washington, D.C. 20004
202.638.4100


_____/s/_____
Robert E. Sanders, Bar 382566
P.O. Box 25385
Winston-Salem, NC 27104
336.659.2999

## CERTIFICATE OF SERVICE

_____I hereby certify that a copy of the forgoing was served by ECF


_____/_____
Joseph R. Conte